COURT OF APPEALS. Albany, March, 1856. *Denio, A. S. Johnson, Comstock, Selden, Mitchell, Wright, Hubbard* and *T. A. Johnson*, Judges.

JAMES G. WYNEHAMER plaintiff in error *vs.* THE PEOPLE defendants in error.

Intoxicating liquors, to be used as a beverage, are property in the most absolute and unqualified sense of the term: and as such as much entitled to the protection of the constitution as lands, houses, or chattels of any description.

All property is alike in the characteristic of inviolability, without reference to the question of its utility.

The prohibitions and penalties of the act "to prevent intemperance, pauperism and crime," pass the utmost boundaries of mere regulation and police, and by their own force, assuming them to be valid and faithfully obeyed and executed, work the essential loss or destruction of the property at which they are aimed. The act is therefore in violation of that clause of the constitution which declares that no person shall be deprived of his property "without due process of law," and is unconstitutional and void.

The terms "law of the land" and "due process of law," as used in the state constitution, are restraints upon legislation, and in all cases require a judicial investigation, not to be governed by a law specially enacted to take away and destroy existing rights, but confined to the question, whether, under the preexisting rule of conduct, the right in controversy has been lawfully acquired and is lawfully possessed.

The word "property" includes the power of disposition and sale, as well as the right of private use and enjoyment; and where a law annihilates the value of property, and strips it of its attributes, by which alone it is distinguished as property, the owner is *deprived* of it, within the meaning of the constitutional provision.

The prohibitory act, in its operation upon property in intoxicating liquors, existing in the hands of any citizen of this state when the act took effect, is a violation of the provision in the constitution of this state, which decrees that no person shall be "deprived of life, liberty or property without due process of law," inasmuch as the various provisions, prohibitions and penalties of the act substantially destroy the property in such liquors.

Inasmuch as the act does not discriminate between such liquors existing when it took effect as a law, and such as might thereafter be acquired by importation or manufacture, and does not countenance or warrant any defence based upon the distinction referred to, it can not be sustained as to any such liquor, whether existing at the time the act took effect or acquired subsequently.

Wynehamer *v.* The People.

It would be competent for the legislature to pass such an act as the one under consideration, (except as to some of the forms of proceeding to enforce it,) provided such act should be plainly and distinctly prospective as to the property on which it should operate.

The question whether "legislative power" is not limited beyond the restrictions specially declared in the constitution, discussed by COMSTOCK, J.

The plaintiff in error was indicted in the Court of Sessions of Erie county, and charged with having sold intoxicating liquor in small quantities contrary to the provisions of the prohibitory liquor act of April 9, 1855. Upon the trial, several exceptions were taken to the decisons of the court, involving the validity of the indictment, the regularity of the proceedings and the construction and constitutionality of the act.

Evidence was given on the trial tending to show that on several occasions between the 4th and 14th of July, 1855, the plaintiff in error had sold and delivered to divers persons brandy in quantities less than one pint at his bar in Buffalo, which was drank on his premises. After the prosecution had rested the cause, the counsel for the plaintiff in error asked the court to direct the jury to find a verdict of not guilty, on the following grounds:

1. That it did not appear that any offence had been committed by the defendant.

2. That the charges in the indictment were not proved.

3. That it did not appear but what the liquor, alleged to have been sold, was liquor the right to sell which was given by the laws of the United States.

4. It did not appear but that the liquor sold was imported into this country by the defendant from foreign countries, in pursuance of the laws of the United States.

5. That the first section of the act in question is in violation of the constitution of this state and of the United States and is void.

6. That the fourth section of said act is likewise contrary to said constitution and is void.

7. That the whole act is unauthorized by and in conflict with the laws and treaties of the United States and the constitution of the state of New York and is void.

8. That it does not appear but that the liquor sold by the defendant was authorized to be sold by the statute as above referred to.

The court overruled these exceptions and the defendant excepted.

The defendant's counsel then offered to prove that the liquor proved to have been sold by the defendant was imported into this state from foreign countries under and in pursuance of the revenue laws of the United States, and that the legal duties had been paid thereon. That the defendant purchased such liquors from the importer in the imported packages and sold to the persons and at the times proved by the witnesses for the prosecution.

This evidence was objected to by the counsel for the people and excluded by the court, to which decision the counsel for the defendant excepted.

The defendant's counsel then offered to prove that the liquors proved to have been sold by the defendant were had and owned by him on and before the 3d day of July, 1855. This was also objected to and excluded and the decision excepted to. The defendant was convicted and sentenced to pay a fine of $50, and to stand committed until paid. On a writ of error, the judgment was affirmed in the Supreme Court sitting in the eighth judicial district. The decision in the Supreme Court is reported *supra* page 377. The defendant brought the case by writ of error to this court.

*Amasa J. Parker,* for the plaintiff in error, after discussing other questions of irregularity raised at the trial, made the following points on the merits.

IV. By the true construction of the first section of the prohibitory act, all imported liquors are exempted from its operation; and the court erred in excluding evidence that the liquor in question was imported liquor, and was purchased from the importer in the imported packages.

1. It is conceded that the *intention* of the legislature, legally

ascertained, is to govern in the construction of a statute, but that intention must be ascertained from the statute itself. " Courts of law can not consider the motives which may have influenced the legislature or their intentions *any further than they are manifested in the statute itself.*" (By SPENCER, J., in *People* v. *Utica Ins. Co.*, 15 *John. R.* 394; *Smith on Statutes*, § 505, 545; *Walker* v. *Harris*, 20 *Wend.* 561; 7 *Barn. & Cress.* 569.)

2. " It is not allowed to interpret what has no need of interpretation." *Quoties in verbis, nulla est ambiguitas, ibi nulla expositio contra verba fienda est.* In the absence of ambiguity no exposition shall be made which is opposed to the express words of the instrument. (*Broom's Leg. Max.* 266; *Vattel, Book ii, ch.* 17, § 263; *Smith on Statutes,* § 505, 545; 13 *Mass.* 343; 1 *Kent. Com.* 462.)

3. Effect must be given, if possible, to every clause and sentence of the act. (*Smith on Statutes,* § 527; 7 *Barn. & Cress.* 569; *McKay* v. *Detroit Plank R. Co.* 2 *Mich. R.* 138.)

4. Penal statutes are laws in restraint of natural liberty, those which forbid anything not in itself unlawful, or inflict penalties or work forfeitures, and they are to be construed strictly. If the language will admit of two meanings, the court shall determine that the lawgiver intended that construction which will exempt the subject from the penalties and provisions of the act. (*Smith on Statutes,* § 468, 495, 738; 7 *Cowen R.* 252; 1 *Kernan,* 601.)

5. These rules have been disregarded in the judgment given in the Supreme Court. Applied to the act in question, the last clause of the first section exempts imported liquor from the operation of the act. " *This section shall not apply to liquor the right to sell which in this state is given by any law or treaty of the United States.*"

6. The revenue laws permit the importation ,of brandy in casks of not less than fifteen gallons capacity, and it has been decided by the Supreme Court of the U. S., that under the laws and treaties of the U. S., the importer has a right to sell his imports in the imported packages or casks, and that a state

law requiring the importer to take out a license to and pay fifty dollars therefor was void. (*Brown* v. *Maryland,* 12 *Wheaton, R.* 419.)

7. The right to sell imported liquor in this state, is thus given to the importer by the laws and treaties of the United States, under the constitutional provisions which give to congress the power to regulate commerce and prohibit a state from laying a duty on imports. This right is applicable to all imported liquor and to no other.

8. The language of the last clause of the first section is clear and explicit. There is in it no obscurity or ambiguity, and it " needeth not to be interpreted." It exempts a certain kind of property from the operation of the statute. If it does not mean imported liquor, it means nothing. No one has suggested any other meaning. The statute is highly penal, and liable to no fraud or loose construction.

9. The language of the exception is descriptive of a certain species of property. Its identification does not depend upon the length of time the right to sell under the U. S. laws may continue in this state. It continues long enough to designate the kind of liquor, and to distinguish it from all others.

10. The seventh section corroborates the view I have taken. It prescribes a rule of evidence upon the question whether the liquor is imported. The 22d section protects the liquor in the hands of the importer, and in selling in the original packages to a person authorized by the act to sell. So far as this goes, it harmonizes with the other exception. The last clause of the first section excepts imported liquor from the operation of that section. The clause in the 22d section excepts original packages in the hands of the importer from all the provisions of the whole act.

V. If imported liquor is not excepted from the operation of the statute, then we say the statute is void because it conflicts with the laws and treaties of the United States which authorize a sale. (*Const. U. S. art.* 6, § 1.)

1. If congress has power to regulate a subject matter, a state

can not interfere to oppose or impede such regulation. In such case, if a state law conflicts with the act of congress, the state law must yield, because the constitution says, that acts of congress passed within the scope of the constitutional power of congress are the supreme law of the land. (5 *How. R.* 573–4 *Ch. J. Taney*; 1 *Wheaton,* 304; 3 *id.* 309; 6 *id.* 384; 16 *Peters,* 530.)

2. In *Brown* v. *The State of Maryland,* the Supreme Court of the United States has decided that a state law conflicting with the free right of the importer to sell in the imported package was void, because it would render the imported article valueless.

To forbid a sale by the person buying from the importer would render the property equally valueless and would equally prevent importation.

3. A state may regulate the sale of imported property and may tax it like other property after it has passed from the hands of the importer, but it has no power to prohibit a sale. It can not accomplish indirectly what it is forbidden to do directly.

4. The license cases (5 *Howard Rep.*) do not contravene this doctrine. Those were cases of regulation, not of prohibition. They were so treated by counsel in the argument. (5 *How. Rep.,* 550, 551.) As to the New Hampshire case, it turned upon another point, viz: that congress had never exercised its constitutional power to regulate commerce between the states, the liquor not being in that case imported, but brought into New Hampshire from Massachusetts. The expressions in the opinions of some of the judges, that states might even prohibit the sale of imported liquor, after it had passed to the hands of a purchaser from the importer, are *obiter* and were not called for by the facts of the case.

5. It will not be denied but this statute is prohibitory. It aims to prevent the use of intoxicating liquor as a beverage. It enforces absolute prohibition. (*See Point VII.*)

VI. The prohibitory act is void because it impairs the " obligations of contracts " contrary to an express inhibition in the

Wynehamer *v.* The People.

constitution of the United States. (*Const. U. S., art.* 1, § 10, *sub.* 1; *Story on Const.* § 1368 *to* 1393; *Smith on Stat.,* 250; *Dartmouth Col.* v. *Woodward,* 4 *Wheat.,* 578; 1 *Ohio State R.,* 638.)

1. This provision of the constitution is violated by an act affecting the tenure or title to property acquired under a contract, or interfering with the right to use and enjoy the property in any manner which was lawful at the time of acquiring title. (1 *J. J. Marsh,* 568; 6 *Cranch,* 135; 8 *Wheaton,* 91; 1 *Dana R.,* 488; 3 *Story Const.* § 1370.)

2. In this case the accused offered to prove that he came by the liquors by purchase.

3. The legislature has the power to regulate, but not the power to destroy or to prohibit it. It is like the control the legislature has over the remedy which it may exercise, provided it is not carried so far as to trench upon an existing or vested right. (4 *Wheat.,* 122; 2 *Kent. Com.,* 397; 1 *Kern. R.,* 281; 1 *Denio,* 274; 1 *Howard R.,* 311; 2 *id.* 608; 8 *Wheat.* 1; 11 *Penn.* 480.)

Our license laws regulated but did not prohibit the sale. In quantities above five gallons there was no restriction.

VII. The act in question is a violation of the provisions of the United States and state constitutions, which declare that " no person shall be deprived of life, liberty or property, without due process of law," and that " no member of this state shall be disfranchised or deprived of any of the rights and privileges secured to any citizen thereof unless by the law of the land or the judgment of his peers " and that no state shall pass any bill of attainder. (*Const. of N. Y., art.* 1, § 1 *and* 6; *Const. of U. S., art.* 1, § 10; *Amendments to Const. U. S., art.* 5.)

1. It will not be denied but intoxicating liquors are property. " Spirits and distilled liquors are universally admitted to be the subjects of ownership and property, and are therefore subjects of exchange, barter and traffic," .&c. (5 *How. R.,* 577, *Taney, Ch. J.*)

2. They are admitted to be property by the act itself, which

treats them as legitimate subjects of ownership. (1 *Curtis R.* 328–9; 33 *Maine R.*, 561–2.)

3. On the 3d day of July, Wynehamer was the owner of the property in question, enjoying all the rights incident to ownership. On the 4th day of July that same property was rendered valueless, by the *fiat* of the legislature, which deprived him of the power of sale.

4. But the act goes even farther. It leaves nothing to inference. By the twenty-fifth section, all liquor kept in violation of any provision of the act was declared to be a public nuisance. The property, with all its rights and incidents, is thus annihilated by legislative edict. On the third it had value and was protected by law. On the fourth its very existence became a crime. It had ceased to be property. A more palpable deprivation of property can not be conceived. .

5. But it is said this is done by "due process of law." It is done without any process of law and by a mere legislative enactment. It is a gross usurpation by the legislature of judicial functions. Judge Green admits that liquor is property, that the right to sell property is one of its recognized legal incidents, and that "due process of law" means a trial and judgment in regular judicial proceedings. But in claiming the right to regulate the sale of property, he overlooks the fact that the property here with all its rights and incidents was obliterated by a mere legislative act.

6. The case recently decided in the fourth district (*The People* v. *Quant*) is put upon a still more dangerous ground. The alarming doctrine is in this case declared, that if the act is otherwise constitutional, the violaters of it may be deprived of their property under its provisions and it will be by due process of law. This is a startling proposition. It nullifies the constitutional restraint upon legislative power. It substitutes the will of the legislature for a regular judicial judgment.

7. The words "law of the land" do not mean a statute passed for the purpose of working the wrong. They mean by due course of law; by indictment or presentment of good and

lawful men. And "due course of law" means law in the regular course of administration through courts of justice. (*Coke* 2 *Inst.* 45, 50; 2 *Kent Com.* 13 *and note to* 7 *ed.*; 4 *Hill* 140, 145; 4 *Dev. N. C.* 15; 3 *Story on Const.* 661; 2 *Yerger*, 500, 554; 5 *Watts & Serg.* 173; 1 *Curtis* 325.)

In South Carolina the words "laws of the land" in the state constitution have been decided to mean the common and statute law existing in that state at the adoption of its constitution. (*State* v. *Simons*, 2 *Speers R.* 767.)

8. The act in question has the most objectionable characteristics of a bill of attainder. It forfeits, and confiscates the property of the citizen. (1 *Dana R.* 510; 6 *Cranch. R.* 137; *Story Const.* § 1338, 9; 1 *Curtis*, 337.)

9. The object of the prohibitory act is absolute prohibition of the use of intoxicating liquor as beverage The whole scheme of the act is to adjudge liquor a nuisance. If that general scheme is unconstitutional and void, so are also all the means by which it is to be enforced. If any of the provisions necessary for accomplishing the object are invalid, the whole and every part of the act must fail. (*Newell* v. *The People*, 3 *Selden*, 9–23; 6 *Eng.* (*Ark.*) *R.* 500.)

10. The legislature has no constitutional right to adjudge property to be a public nuisance, and thus to place it beyond the pale of ownership and protection. The legislature can not deprive the citizen of that which the constitution says he shall have and enjoy.

A public nuisance is that which is inconvenient or troublesome to the whole community in general, and not merely to some particular person. (4 *Black. Com.* 167.) It is indictable but not actionable.

Now liquor "kept" can not be a nuisance. It is harmless of itself, nay, it is useful and is conceded to be, for certain purposes, by the act in question. It is no reason for declaring it a nuisance that it may be abused. So may every article of food and even cold water itself.

Whether an article is a nuisance is a judicial, not a legislative question, and it can only be ascertained "by due process

of law." (3 *Story's Const.* § 1338, 9; 4 *Devereux, R.* 1; ·16 *Ohio, R.* 540; 7 *How.* 407.)

11. By a legislative sentence all liquor " kept " in violation of the act is condemned 'and ceases to be property. All the other provisions of the act are the means of enforcing this legislative judgment, and many of them, considered severally, are enacted in utter disregard of constitutional rights. (5 *Ark.* 506; 7 *Texas R.* 365.)

12. In addition to the unreasonable searches authorized and the seizure and confiscation of property without due process of law, the putting a person twice in jeopardy for the same of-fence, &c., &c., it violates in express terms that provision of the constitution which declares that " the trial by jury in all cases in which it has been heretofore used, shall remain invio-late forever." (*State Const. art.* 1, § 1.)

This means a common law jury of twelve men. (2 *Kern. R* 198, *Johnson, J.*) And " heretofore used," means used at the adoption of this constitution. Such was the meaning given by the Court of Errors, to the same words in the constitution of 1821. (*Duffy* v. *The People,* 6 *Hill,* 78.)

At the time of the adoption of the present constitution, there was not a single misdemeanor which could compulsorily be tried without a common law jury.

·A few misdemeanors were triable by a court of Special Sessions, provided the accused elected to be tried; but there was not one in which he might not insist on a trial elsewhere by twelve men. (4 *Wheat. R.* 235.)

13. The constitutional protection extends to 'newly created offences as well as to previously existing offences. If not, the legislature is omnipotent, and there is no protection against its despotism. All cases in which it has been heretofore used means all cases of the same grade. All previous misdemeanors being triable by a common law jury, unless waived by the accused, a newly declared misdemeanor must bring the same right with it.

But if it were otherwise, it would not affect this particular case, for selling liquor contrary to law was a misdemeanor

when the constitution was adopted, and is made the same by this act. That particular misdemeanor was never before triable by a court of Special Sessions even by consent.

This is the first time in the history of this state, that the attempt has ever been made to compel a person to be tried even for a misdemeanor, before a court of Special Sessions, if he was willing to give bail to appear before a higher tribunal where he could have a common law jury.

Even in a civil case, no matter how trifling, it is not in the power of the legislature to deprive a party of his constitutional right of trial by jury.

In all criminal prosecutions the accused has a right to a speedy and public trial *by an impartial jury*, &c., (*Bill of rights*, 1 *R. S. 3d ed.* 95, § 14; 6 *Eng. R.* 500; 1 *Wash. R* 299.)

14. If I am wrong in this view, or if it is apparent that the legislature intended to give power to a magistrate to try this offence, then it follows that the legislature, having created a new offence and having especially authorized a certain tribunal to try it by conferring on it a new power, that tribunal has the exclusive power to try the offence.

Where a statute confers a right and prescribes adequate means of protecting it, the proprietor of the right is confined to the statutory remedy. (*Dudley* v. *Mayhew*, 3 *Comst.* 9, 15, 16.)

If an act has prescribed the remedy for the party aggrieved, and the mode of prosecution, all other remedies and modes are excluded. (*Miller* v. *Taylor*, 4 *Burr.* 2323; *McKeon* v. *Caherty*, 3 *Wend.* 494.)

Where a statute creates a new offence and gives a particular penalty, the party will not be punished by indictment. (*Rex* v. *Robinson*, 2 *Burr.* 803; *Watson's case*, 6 *Mod.* 86; *Castle's case*, *Cro. Jac.* 643; *People* v. *Stevens*, 13 *Wend.* 342.)

It follows then, that the prosecution *must* be before a court of Special Sessions and not by indictment.

15. It is no answer to this last argument to say that by section 23, grand juries are to be charged to inquire into

offences under the act. No jurisdiction can be obtained by inference. Besides, there is enough else under the act proper for their consideration, and which they may be presumed to have had in view in the nuisances declared by it, and the perjuries likely to be committed in its execution. It is quite significant of the exclusive intention of the legislature that it has given an appeal by either party from a judgment of the magistrate, and none from any judgment by a court of Oyer and Terminer or Sessions.

VIII. However extensive may be the power of the legislature over prospective acquisitions, it can never prohibit the use of property already acquired. That would destroy a vested right. In this case, Wynehamer owned the property before the act took effect. To declare such property forfeited, would be an *ex post facto* law and void. (33 *Maine R.* 559; *Const. U. S. art.* 1, § 10.)

IX. It is only the " legislative power " that the people have vested in the legislature. Even if there were not any express constitutional restriction, the legislature would have no power to pass this act. It is a violation of the settled maxims and principles of a free government. It is an invasion of natural right and the authorities are ample to show that such an act will not be enforced by the courts. (4 *Barb. R.* 71; Barculo, J. 2 *Peters R.* 657; 4 *Hill,* 145; 3 *Dallas,* 386; 4 *Devereux R.* 1; *Blackwell on Tax Titles,* 15, 16, 17, 21, 22; 1 *Dana,* 511; 1 *J. J. Marsh,* 566, 571; 1 *Ohio Stat. R.* 633; 3 *Dallas,* 388; 2 *Cranch,* 390.)

1. " Civil government is not entitled, in ordinary cases and as a general rule, to regulate the use of property in the hands of the owners, by sumptuary laws or any other visionary schemes of frugality and equality." (2 *Kent Com.* 329.)

2. It is a universally recognized theory of government that absolute and despotic sovereignty, which must exist somewhere in every organized political society, does, by our system remain with the people, and that the legislative power, which has been conferred upon government, is only such portions of that absolute sovereign power as is necessary to accomplish the design and object of government, which is the security and protection.

Wynehamer *v.* The People.

of the persons and property of all the citizens. (1 *Lieber's Pol. Eth.* 188,.9, 194, 202; *Woodeson's Lec. upon Law; Vattel, Book* 4, § 45, 51; *Works of John Locke, vol.* 5, *ch.* 11; 1 *Ohio State R.* 633; 3 *Dallas,* 386; 6 *Cranch,* 87; 2 *Dallas,* 310; 4 *Hill,* 146; 2 *Kent Com.* 339; 2 *John. Ch.* 162; 4 *McLean,* 497; 3 *Story Const.* § 1393; 5 *Watts & Serg.* 174; 9 *Gill & J.* 408.)

3. Under these universally reserved rights we are to be protected against all sumptuary laws and all interference with personal rights. It is not in the power of the legislature to say what we shall eat or drink or wear, or to adjudge an article of property recognized as valuable and useful from the earliest ages, the use of which has been sanctioned by divine example, to be a nuisance and to make it criminal to keep, sell or give it away. (*Plin. Nat. Hist. Lib.* 14, *c.* 22; 2 *Herod.* 76; *Dion. Cassius, Lib.* 49; *Tacitus de Mor Ger. c.* 23; *Songs of Solomon,* 8, *v.* 12; *Psalms,* 104, *v.* 14 *and* 15.)

4. The power of police regulation authorizes the destruction of what is of itself noxious; but it does not authorize the destruction of what is in itself good, because a bad use may be made of it. The power of police regulation results from necessity, and is itself on the very verge of authority. This act goes far beyond it.

X. The indictment in this case is based upon, and can only be sustained under the act of April 9, 1855, called the " prohibitory act." It refers to the statute by its title and conclusion, and seeks to bring this case within that act alone. It can not be sustained under the Revised Statutes,

1. Because those laws are repealed.

2. Because the indictment is not within the words of the old statute and does not charge the offence created by that act. (*Bar. Cr. L.* 332, 333.)

It does not allege the selling of " strong or spirituous liquors or wines," nor " in quantities less than five gallons," nor that it was sold *without license.* The indictment would be bad on error or in arrest of judgment under the excise act. (*Wharton's Am. Cr. Law,* 815, 3d *ed.;* 24 *Pick. R.* 374; 15 *Verm. R.* 290· 6 *Leigh,* 667.)

*Albert Sawin* for defendant in error.

*First.*—There is no law or treaty of the United States giving the right to the *importer* of liquors, or any other person, to sell the same in the original package or otherwise, in this state.

I. It is admitted there is no treaty or law of congress, in *express words,* authorizing the importer of brandy or distilled spirits or wine, upon payment of duties under the revenue laws of the United States to sell the same.

The acts of congress bearing on the question are as follows:

The first act of regulation of imports, passed March 2, 1799, vol. 1, sec. 103, p. 701 of United States Statutes at large, prohibits the importation of distilled spirits in less quantities than ninety gallons.

By act of 2d March, 1829, and of an act of 27th February, 1830, which are now in force, brandy may be imported in casks of a capacity of not less than than fifteen gallons.

The last tariff act passed July 30, 1846, vol. 9, p. 44, schedule A of statutes at large, imposes a duty upon brandy of one hundred *per centum, ad valorem.*

II. The constitution of the United States and laws of congress authorizing the importation from foreign countries of distilled spirits, and imposing duties thereon, do not, *by implication,* give the right of sale of the same in this state to the importer or any body else.

1. There has been no adjudication of the Supreme Court of the United States to that effect.

The case of *Brown* v. *The State of Maryland* (12 *Wheaton* 410,) decided in 1827, arose under a state law prohibiting importers from selling "*without taking out a license for which they shall pay fifty dollars,*" and Chief Justice Marshall held the act repugnant to that clause in the constitution which declares "that no state shall lay any imposts, or duties on imports or exports." The question was one of taxation.

Afterwards, in 1847, the Supreme Court of the United States held that the laws of New Hampshire, Massachusetts and Rhode Island, regulating the sale of intoxicating liquors,

Wynehamer. *v.* The People.

were not inconsistent with the federal constitution, or acts of congress under it, and in doing so, all the judges expressly held one important portion of the opinion of Chief Justice Marshall in above case to be *obiter*, and three of them, Justices Daniel, Woodbury and Grier, substantially adjudged that so much of Chief Justice Marshall's opinion in the case of *Brown* v. *Maryland*, as held that state governments could not prohibit sales by the importer in the original packages, to be " not the point settled, or the *substantial reason* for it." (*See* 5 *Howard, vages* 505 *to* 633.)

III. But even if congress possess the right under their power to regulate commerce, to authorize the importer of foreign liquors to sell the same in this state, *that power has not been exercised*, and therefore, according to the unanimous opinion of the justices of the Supreme Court of the United States, in the above cited New Hampshire case, the legislation in this state does not conflict with that of the federal government.

It follows, therefore, that no construction can be given to the excepting clause under consideration, that would render the proof offered material; in other words, there is no liquor " the right to sell which in this state is given," either in express terms or by implication by any law or treaty of the United States.

The court will probably see from the examination of the other points presented below, that the decision of the first proposition is of no *practical* consequence in this case, yet it is peculiarly fit that the bar, and the courts, should upon all proper occasions, when satisfied that the precise question is yet open for argument in the Supreme Court of the United States; maintain the right of every state " to regulate its own *internal* traffic according to its own judgment, and upon its own views, of the interest and well being of its citizens."

*Second.*—Assuming, however, (as the legislature undoubtedly did,) that the federal judiciary have given such a construction to the law of congress as authorizes the importer of brandy to sell it within this state in the original cask or package, (not

less than fifteen gallons,) then the brandy charged in the indict-ment and proven to have been sold by the defendant, at his bar in quantities lest than one pint, and drank on his premises, *is not the " liquor "* named in the last clause of said first section, within the intent and meaning of the exception.

I. Construing the clause by itself, adopting the most strin-gent rule of subtle and strict construction, (" the letter that killeth instead of the spirit that maketh alive.") It is sub-mitted—

1. The words *" is* given "— the present tense, clearly limit the operation of the exception, as the technical words in an indictment " then and there " do — to the specified liquor charged in the indictment.

2. The words " is *given"* means " is granted in *express terms."*

3. The words " liquor the right to sell which is given by," are *equivalent* to the following words: " the sales of liquor au-thorized by."

4. There is no pretence under any construction by the Su-preme Court of the United States, or any judge thereof, of any act of congress, that the right to sell liquor is attached to or flows with the liquor. " The right to sell which," is a right not " given " to the *liquor* but to the *person.* What person? The importer.

II. But if there is any doubt as to the meaning of the ex-cepting clause, such a construction should be given to it as will put in force the intent of the lawmakers, which can be done only by limiting it to sales of liquor in the original pack-ages by the importer.

This can be done in the application of well settled rules for the construction of statutes, *without adding to, or taking from, the whole act a single word, and at the same time give weight and meaning to every word therein.*

But it has been argued that penal statutes should be con-strued so strictly, as that the intent of the legislature should not be diligently sought out.

This pestilent dogma has no foundation in principle, and is not sustained by authority.

" However true it may in the general be, that penal laws are to be construed strictly, yet, even in the construction of them the intention of the legislators ought to be regarded." (Bacon's abridgment, title statute, cases, 1 *Durnford & East, Rex* v. *Hodnet, p.* 96; 3 *Rep.* 7; *Heydon's case,* 8 *Mod.* 65; *2d Atkins,* 205.)

The statute declared it to be treason for a servant to kill his *master.* The court held, that applied to his master's *wife.* Croke, J., saying: " Notwithstanding that a statute which increases a punishment beyond what it was at the common law, ought not to be extended by an *equitable* construction, yet the words of such statute ought to be construed *according to the intention* of the makers of the statute.

So in the soldier's case, (*Croke C.,* 71). The statute making the departure of a soldier from his *captain* without license, felony. It was held by nine judges against three, that a departure of the soldier from his *conductor,* was within the meaning of the act.

That a penal statute when made for the public service and good of the king and realm, ought to be construed according to the intention of the makers of the statute.

So in *Poulter's case,* (11*th Rep.,* 35, 35,) it is said: " There are many cases in our books where penal statutes have been construed by *intendment* for the suppression of a mischief," &c.

Spencer, J., in delivering the opinion of the court in the case of *Sickles* v. *Sharp,* (13 *John. p.* 497,) says: " The rule that penal statutes are to be construed strictly when they act on the offender, and inflict a penalty, admits of some qualification."

In the construction of statutes of this description, it has often been held that the plain and manifest intention of the legislature ought to be regarded.

A statute which is penal as to some persons provided it is beneficial generally, may be equitably construed.

Even in case of felony, the courts have regarded the intention of the legislature.

A statute which is made for the good of the public, ought, although it be penal, to receive an equitable construction. (2 *Brown,* 110, 111, 116.)

" Yet penal statutes are taken strictly and literally, only in the point of defining and setting down the *fact* and *punishment,* not in words that are but circumstances and conveyance in the putting of the case." (*Bacon's Maxims,* 51, 58, 59.)

Chief Justice Marshall says, (5 *Wheat., p.* 76,) " Although penal laws are to be construed strictly, they are not to be construed so strictly as to defeat the obvious intention of the legislature."

Woodworth, J., in delivering the opinion of the court, in the case of *The People* v. *Bartow,* (6 *Cowen,* 293,) says, " Although a penal statute is to be construed strictly, the courts are not to disregard the plain intent of the legislature.

" Among other things it is well settled, that a statute which is made for the good of the public, ought although it be penal, to receive an equitable construction. When it is considered that this statute (the restraining act) was intended to strike at an existing evil, deemed to be of serious injury to the community, it can not well be doubted that its enactment was to promote the public good."

Justice Story, in the 1st of *Gallison's Reports, page* 118, says: " We are obviously bound to construe penal statutes strictly, and not to extend them beyond their obvious meaning by *strained* inferences.

" On the other hand we are bound to interpret them according to the manifest import of the words, and to hold all cases which are within the words and *mischief* to be within the *remedial* influences of the statute; and this is what I understand by expounding a statute liberally as to the offence."

Again in the 3d *Sumner's Reports, p.* 211, says the same judge in reference to penal statutes, " The proper course is to search out and follow the intent of the legislature, and to

adopt that sense of the words which harmonize best with the context, and promotes in the fullest manner the apparent policy and objects of the legislature."

Justice Woodbury, in the *2d New Hampshire Reports, p.* 195, says: " A statute if of public utility, as the uniform presumption, should be so construed as to effectuate the intention of the makers. The intention, to be sure, is to be gathered from the language and *subject matter* of the statute. But when once so gathered, it is no less important to society, and no more severe upon the offender to enforce it in penal statutes than in remedial ones.

" Without such a construction, too, this class of statutes become almost a dead letter, prosecutions are a mockery and malefactors encouraged."

Chief Justice Parker, in the *8th of Pickering, p.* 370, says, (in relation to this rule, penal statutes must be strictly construed) " This did not exclude the application of *common sense* to terms made use of in the act, in order to avoid an absurdity which the legislature ought not to have been presumed to have intended. There were cases which showed this, *although precedents were not required* to sustain so reasonable a doctrine. (*See* 15 *Wendell's Reports,* 147.)

A penal statute may also be a remedial law, penal in one part and remedial in the other. ( 1 *Wilson,* 126; *Douglass,* 702; 1 *Selden,* 562.)

The foregoing citations furnish precedents, (if any were necessary) for the application of well established rules for the construction of *all* statutes, to the act for the suppression of intemperance, though it be called a penal statute.

1st.—The rule in *Heyden's* case. " What was the state of the law before the act?"

The law of the state granted licenses to sell intoxicating liquors in small quantities; and it was supposed the United States laws granted the right to sell in large quantities.

" What was the *mischief* against which the former law did not provide?"

The general use, especially in public places, of ardent spirits as a beverage.

" What remedy has the legislature provided by this act to cure the defect?"

The abolition of licenses for the sale of ardent spirits, and the prohibition of the sale of intoxicating liquors as a beverage.

" What was the true reason for the remedy?"

The " intemperance, pauperism and crime," resulting from its use.

The mischief, remedy and reason for the remedy are attached more strongly to imported liquors than home-made.

2d.—The rule in *Plowden,* 565. " A saving clause in a statute is to be rejected when it is directly repugnant to the purview or body of the act, and could not stand without *rendering the act inconsistent with, and destructive of itself."* (*See* 15 *Peters,* 445; 1 *vol. Kent's C.* 463.)

3. The rule that the intention of the lawgiver and the meaning of the law are to be ascertained by viewing the *whole and every part of the act.* (*See Broom's Legal Maxims,* p. 448, *and opinion there cited by Justice Coleridge.*)

Putting the first and twenty-second and fourth sections together, of this act, then the plain reading, " whoever shall sell intoxicating liquor, except liquor in original packages, the right to sell which is given by law or treaty of the United States to the importer thereof, shall be guilty of a misdemeanor."

4. The rule that all words, whether they be in deeds or statutes, or otherwise, if they be general and not express and precise, shall be restrained unto the *fitness of the matter and person.* (*Bacon's Maxims, Reg.* 10; *Broom's Maxims,* 501; *id.* 140, 439.)

III. This act is not, so far as it bears on the case at bar, a penal statute within the meaning of the rule construing penal statutes strictly. It created no new offence and imposed no new punishment.

1. The selling of intoxicating liquors in this state, England and all civilized countries, has been for centuries the subject of penal legislation.

2. Instead of increasing the punishment for unlawful sales, it diminishes it, (provided our old excise laws are repealed by it.) Under the Revised Statutes, the overseers of the poor recovered from the seller twenty-five dollars for each sale under five gallons. In addition, for the same sale, the party was subject to an indictment; the punishment of which was both fine to the amount of two hundred and fifty dollars and imprisonment for one year in the county jail.

*Third.*—None of the provisions of the act for the suppression of intemperance, pauperism and crime, *applicable to this case,* the retail sale of intoxicating liquors at a tippling shop, and *this proceeding,* by indictment the " due process of law " of the constitution are repugnant to or in conflict with any of the provisions of the federal or state constitutions.

I. If they were, then the judgment of the courts below should be affirmed, because,

1. The 25th section of present act prohibits the granting of licenses.

2. The other provisions of excise act (1 *R. S.* 681,) are not in terms repealed, only by implication, upon the ground that they are inconsistent with the present law. If that is no law then the excise act is in force, and the indictment and proof in the present case are applicable to the 15th and 16th sections of excise law. (*See* 5 *Denio,* 70, 112; 3 *Barbour,* 548.)

II. If some of the numerous sections of the law, under examination, are in conflict with the constitution, the *whole law* is not thereby rendered a nullity. (*Mowrys* v. *Dake,* 8 *Term R.* 411; 5 *Denio,* 646; 16 *Wend.* 61; 14 *id.* 265.)

The question in this case is, is so much of this act valid, as declares " whoever shall hereafter sell intoxicating liquors, except for sacramental, mechanical, medicinal, or chemical purposes, shall be guilty of a misdemeanor?"

• The question upon the proof in this case is still narrower,

and may be stated in this form: " Is a law prohibiting the sale of liquor to be drank on the premises, where sold as a beverage, unconstitutional?"

III. Such prohibition does not deprive any person of his property within the meaning of the constitutional provision upon that subject. (5 *Cowen*, 538; 7 *id.*585; 4 *Wendell*, 9; 3 *Cowen*, 686; 20 *John.* 258.)

1. Such prohibition is the mere exercise of the police power of the state, the most essential and valuable element of government.

2. The end sought by it is expressed in the title, " the prevention of intemperance, pauperism and crime." In the language of Justice Woodbury: " It aims at a right object, and is calculated to promote it. It is adapted to no other, and no other sinister or improper view can therefore either with delicacy or truth be imputed to the legislature."

3. The means—prohibition of the sale of intoxicating liquors for use as a beverage—being adapted to the accomplishment of the praiseworthy object expressed in the title of the act, and in no wise in conflict with any provision of the constitution, this court will not inquire whether such prohibition is the *most prudent* or *most feasible* that might be devised by statesmen to produce the result desired. Those considerations belong exclusively to the legislature.

In the language of Chief Justice Marshall: " The judicial department can listen only to the mandates of law, and can tread only that path which is marked out by duty." (4 *Peters*, 410; 4 *Wheaton*, 316; 14 *Howard*, 39; 7 *id.* 1; *Opinion of Chief Justice Taney.*)

*Fourth.*—None of the provisions of the " act for the prevention of intemperance, pauperism and crime," *applicable to this case*, the retail sale of intoxicating liquors, and this proceeding, by indictment, (whatever opinion may be formed of the validity of other provisions) being in conflict with the constitution of the United States, or of this state, if the allegations of the sellers of intoxicating liquor were true, that those constitutional provisions are arbitrary and despotic, and therefore in conflict

with natural justice, this court nevertheless will affirm the judgment in this case, and the validity of such provisions of the statute, because *judges* in the exercise of judicial power can not recognize any higher law than the constitutions of this state and of the United States. (20 *Johns.* 102; *id.* 735; 21 *Wendell,* 563; 1 *Hill,* 324; 20 *Wendell,* 365; 11 *Peters,* 420; *Gredell's opinion,* 3 *Dallas,* 399.)

*Parker,* in reply.

It is probably sufficient for the plaintiff in error in this case, that " property " is expressly protected by the constitution. But if there were no such exception, its protection and the protection of certain personal rights would be implied.

It is a dangerous heresy to say that " the constitution is a restriction upon the powers which the legislature would otherwise possess." On the contrary it is well settled by judicial decisions, that the legislature has no powers but such as are derived from and under the constitution. The constitution is but *a grant of power:* of certain limited and defined powers, to the different departments of government. The constitution is said to be " a power of attorney," " a commission " from the people, under which the legislature acts. (*Blackwell on Tax titles,* 15, 16, 17, 21, 22; 1 *Kent Com.* 452; 4 *Hill,* 144; 1 *Dana R.* 511; 2 *Peters R.* 657; 1 *J. J. Marsh,* 566, 567, 571; 1 *Ohio State R.* 633; 5 *Dallas,* 388; 2 *Cranch,* 390, *and the cases cited under my 9th point.*)

As between the people and their representatives, it is absurd to say that the power of the representatives is supreme unless expressly restrained by the constitution.

" Legislative power " is granted to the legislature, " judicial power " to the courts. The one can not invade the province of the other. If the legislature adjudge a thing a nuisance, it exercises a *judicial* power, and the act is void. This would be so even if the thing were not, as it is in this case, harmless in itself and in its effects also, when properly used. Such a despotic and arbitrary exercise of judicial power would never be made in any *court;* and this case is the best illustration that

can be furnished of the necessity for a strict construction of powers conferred.

The term "legislative power," is to be construed strictly. It can not be enlarged by implication. It being a power revocable, and conferred for the benefit only of the grantors—*a mere agency*—it must be construed so as to protect the rights of the grantors, *that being the sole object of the grant.* The power must be so construed as to preserve, not to destroy. (*Taylor v. Porter*, 4 *Hill*, 144; *Wilkinson* v. *Leland*, 2 *Peters*, 657; *Story on Const.* § 1393, § 1399.)

It is a principle at the foundation of our government that man is endowed by his Creator with certain "*inalienable rights.*" These rights can only be lost by "due process of law." They could not be taken away by the legislature, even if there were no restriction in the constitution.

What is meant by "legislative power?" It does not, certainly, cover every possible legislative act; that would render the legislature omnipotent. But these words "legislative power" are to be construed so as to exclude the powers granted to other governmental agencies and also the *inalienable rights*, I have mentioned. There can be no legislative power over an inalienable right. We can not delegate to another the power to alienate a right that is inalienable.

Under this principle it is, and under this only, that we are protected against the enactment of sumptuary laws. The legislature has not the power to regulate my hours of sleep, or my diet or dress. (2 *Kent*, 329.) These are personal, reserved, inalienable rights, not within the scope of the grant of "legislative power."

This case involves not only the right of the owner to *sell* his property, but also the right of another to *purchase.* The purchaser has as much right to complain as the vendor. As to the purchaser, as to every citizen who may desire to purchase, the act in question is a *sumptuary law,* and void. All citizens are prohibited purchasing the article for use as a beverage. *Absolute prohibition as a beverage* is conceded to be the object and effect of the act.

Wynehamer *v.* The People.

It is a sumptuary law, absolutely prohibiting the purchase for use as a drink, of what is not denied to be a wholesome and useful article, if properly used.

It is thus an invasion by the legislature of the inalienable right of the citizen to judge for himself in relation to his own diet.

It is no answer to say, it may be abused. Its abuse may be punished. but the right to use property can not be taken away.

As a violation of the right of the citizen, therefore, to *purchase,* as well as of the owner to sell, the act is unauthorized and void.

We concede the sale may be regulated as to time, manner, place, license, &c.; but it can not be absolutely prohibited, nor can the citizen be deprived of its proper use as a beverage.

It has been loosely said *obiter,* by one or two judges in other states, that the use of intoxicating drinks might be prohibited, but it has never, in any case, been so adjudged, in a case where that question was involved.

It is the duty of the courts to define the limits of " legislative power," and to declare void every legislative act transgressing such limits. It was done by Chancellor Kent, in *Gardner* v. *The Village of Newburgh,* (2 *John. Ch. R.* 162, 166) in 1816, before the adoption of the constitutional restriction as to protecting private property; and even in England, where the parliament is said to be supreme, Lord Coke held in *Doct. Bonham's* case, (8 *Coke,* 118,) " that the common law doth control acts of parliaments, and adjudges them void when against common right and reason," and Ch. J. Hobart said, in *Day* v. *Savage,* (*Hob. Rep.* 87,) that an act of parliament, made against natural equity, as to make a man a judge in his own case, was void.

In this country, where so much less power is conferred on the legislature, where all sound thinkers concur in the doctrine that " that is the best government which governs least," no one could calculate the train of evils which would flow from

a doctrine which should deprive a citizen of his right to " self-government " in matters not injurious to others.

I was asked by two members of the court, on the argument, where congress got the power to forbid the sale of spirituous liquors to the Indians, as if that were the exercise of the same power claimed for the legislature in passing the prohibitory act.

The answer is a very plain one. The Indians are subjects but not citizens. They can not even become citizens by naturalization. They are regarded as being in a state of pupilage. They are under the protection of government but have no share in it. Even in the states there is the same right to forbid the sale of liquor to them as to infants, apprentices, &c. (1 *R. S.* 681, § 16.) The right as to Indians is exercised in this state. (*Sess. Laws of* 1849, p. 576.)

But it is said the act of congress authorizes the destruction of liquor illegally introduced among the Indians. This is only in the " Indian country." It is not within a state, or even an organized territory of the United States. (Act of Congress, 1834, Ch. 161, § 16.) It is in a region still under the recognized government of the Indians, organized under a treaty and protected by the United States, into which region a citizen of the United States, can only enter as a licensed trader, and a foreigner only by a passport from the war department, and for a limited time. All white men, except officers of government and United States troops, are excluded from the " Indian country." An Indian trader having no right to enter, except by a license and subject to certain conditions, can not, surely, have any legal ground of complaint if liquors surreptitiously and illegally introduced by him are seized and condemned under the 20th section of the act. The property is forfeited by the very conditions of the license by which he entered the country. Besides, so far as the rights of the trader are concerned, the " Indian country " is a foreign government. He has no share in it, has no reserved rights as to person or property, either express or implied.

COMSTOCK, J.—The defendant was indicted and convicted by a common law jury, in the Court of Sessions of Erie county, for selling liquors in small quantities, contrary to the "act to prevent intemperance, pauperism and crime," passed April 9th, 1855. The indictment contains no allega-tions to bring the law within any of the excise laws of the state, even if those can be regarded as unrepealed, and the conviction therefore must stand, if it can stand at all, upon the statute referred to. It was admitted on the trial that the defendant was the owner of the liquors in question before and at the time the law took effect; and his counsel insisted that he was entitled to an acquittal on the ground, among others, that the statute was unconstitutional and void. The proposition was overruled. The Supreme Court in the eighth district affirmed the conviction, thus determining that the act, in its prohibitory clauses, was constitutional and valid; and this is the only question I shall consider.

The constitution of this state has vested " the legislative power," in the senate and assembly, subject, however, to some special limitations, which are of very great interest and importance. It is declared (art. I, sec. 1,) that " no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." It is further declared (art. I, §6,) that no person shall be deprived of life, liberty or property without due process of law. Nor shall private property be taken for public use without just compensation." Without inquiring into the extent of legislative power in the absence of special restraints, I think the case before us can be and should be determined under these limitations, the construction, force and application of which will be hereafter considered.

And in determining the question whether the act " to prevent intemperance, pauperism and crime," was an exercise of power prohibited to the legislature, an accurate perception of the subject to which it relates, is the first requisite. It is then, I believe, universally admitted that when this law was passed,

intoxicating liquors to be used as a beverage were *property* in the most absolute and unqualified sense of the term; and as such, as much entitled to the protection of the constitution as lands, houses, or chattels of any description. From the earliest ages they have been produced and consumed as a beverage, and have constituted an article of great importance in the commerce of the world. In this country, the right of property in them, was never, so far as I know, for an instant questioned. In this state, they were bought and sold like other property; they were seized and sold upon legal process for the payment of debts; they were, like other goods, the subject of actions at law, and when the owner died, their value constituted a fund for the benefit of his creditors, or went to his children and kindred, according to law or the will of the deceased. They entered largely into the foreign and internal commerce of the state, and when subjected to the operation of this statute many millions in value were invested in them. In short, I do not understand it to be denied that they were property, in just as high a sense as any other possession which a citizen can acquire. Judicial authority might be cited, but this does not seem necessary, where there is scarcely a controversy.

It may be said, it is true, that intoxicating drinks are a species of property which performs no beneficent part in the political, moral or social economy of the world. It may even be urged, and I will admit, demonstrated with reasonable certainty, that the abuses to which it is liable are so great, that the people of this state can dispense with its very existence, not only without injury to their aggregate interests, but with absolute benefit. The same can be said, although, perhaps, upon less palpable grounds, of other descriptions of property. Intoxicating beverages are by no means the only article of admitted property and lawful commerce in this state, against which arguments of this sort may be directed. But if such arguments can be allowed to subvert the fundamental idea of property, then there is no private right entirely safe, because there is no limitation upon the absolute discretion of the legislature, and the guaranties of the constitution are a mere waste

Wynehamer *v*. The People.

of words. The foundation of property is not in philosophic or scientific speculations, nor even in the suggestions of benevolence or philanthropy. It is a simple and intelligible proposition, admitting in the nature of the case of no qualification, that that is property which the law of the land recognizes as such. It is, in short, an institution of law, and not a result of speculations in science, in morals or economy.

These observations appear to me quite elementary, yet they seem to be necessary in order to exclude the discussion of extraneous topics. They lead us directly to the conclusion that all property is alike in the characteristic of inviolability. If the legislature has no power to confiscate and destroy property in general, it has no such power over any particular species. There may be, and there doubtless are reasons of great urgency for regulating the trade in intoxicating drinks as well as in other articles of commerce. In establishing such regulations merely, the legislature may proceed upon such views of policy, of economy or morals, as may be addressed to its discretion. The whole field of discussion is open, when the legislature, keeping within its acknowledged powers, seeks to regulate and restrain a traffic, the general lawfulness of which is admitted; but when the simple question is propounded, whether it can confiscate and *destroy* property lawfully acquired by the citizen in intoxicating liquors, then we are to remember that all property is equally sacred in the view of the constitution, and therefore that speculations as to its chemical or scientific qualities, or the mischiefs engendered by its abuse, have very little to do with the inquiry. Property, if protected by the constitution from such legislation as that we are now considering, is protected because *it is property* innocently acquired under existing laws, and not upon any theory which even so much as opens the question of its utility. If intoxicating liquors are property, the constitution does not permit a legislative estimate to be made of its usefulness with a view to its destruction. In a word, that which belongs to the citizen in the sense of property, and as such, has to him a commercial value,

can not be pronounced worthless or pernicious, and so destroyed or deprived of its essential attributes.

Sir William Blackstone, who wrote of the laws of England nearly a century ago, said: " So great is the regard of the law for private property, that it will not authorize the least violation of it, no, not even for *the general good of the whole community.* If a new road, for instance, were to be made through the grounds of a private person, it might, perhaps, be extensively beneficial to the public, but the law permits no man or set of men to do this without the consent of the owner of the land. In vain may it be urged that the good of the individual ought to yield to that of the community, for it would be dangerous to allow any private man or even any public tribunal to be the judge of this common good, and to decide whether it be expedient or no. *Besides the public good is in nothing more essentially interested, than in the protection of every individual's private rights as modeled by the municipal* law. In this and similar cases the legislature alone can and frequently does interfere and compel the individual to acquiesce. But how does it interpose and compel? Not by absolutely stripping the subject of his property in an arbitrary manner, but by giving him a full indemnity and equivalent for the injury thereby sustained." ( 1 *Black. Comm.* 139.) While this. language of the English commentator by no means expresses the full force of the limitation imposed upon the legislature by the people of this state in their written constitution, it contains, nevertheless, a vindication of the sanctity of private property as against theories of public good, eminently applicable to our own condition and times. In a government like ours, theories of public good or public necessity may be so plausible, or even so truthful, as to command popular majorities. But whether truthful or plausible merely, and by whatever numbers they are assented to, there are some absolute private rights beyond their reach, and among these, the constitution places the right of property.

The views thus far expressed, the substance of which I think must command a general assent, which would seem to narrow

the field of inquiry. Do the prohibitions and penalties of the act " to prevent intemperance, pauperism and crime," pass the utmost boundaries of mere regulation and police, and by their own force, assuming them to be valid and faithfully obeyed and executed, work the essential loss or destruction of the property at which they are aimed? If they do, then so far as I can see, nothing remains except to apply the provisions of the fundamental law of the state, and the act must be declared unconstitutional and void. In my judgment they do plainly work this result.

We must be allowed to know what is known by all persons of common intelligence, that intoxicating liquors are produced fo· sale and consumption as a beverage, that such has been their primary and principal use in all ages and countries, and that it is this use which has imparted to them in this state more than ninety-nine hundredths of their commercial value. It must follow that any scheme of legislation, which, aiming at the destruction of this use, makes the keeping or sale of them as a beverage, in any quantity, and by any person, a criminal offence, which declares them a public nuisance, which subjects them to seizure and physical destruction, and denies a legal remedy, if they are taken by lawless force or robbery, must be deemed in every beneficial sense to deprive the owner of the enjoyment of his property. Such, I understand to be precisely the character of this law. The only sales which it permits (*vide* § 2) are for mechanical, chemical and medicinal purposes, and of wine for sacramental use. Even this exception, minute and special as it is, is attended with extraordinary conditions. The person proposing to sell is prohibited, if he pursues any one of some fifteen or twenty lawful avocations; he must be a man of totally abstinent habits, he must give stringent bail, and he must have a good moral character. Sales may also be made to the authorized venders, but as they can only sell for the particular purposes enumerated, of course sales to them can not be made in contemplation of any other purpose or use.

With these exceptions, so minute and trivial as scarcely to disturb the general scheme, the act is one of fierce and intol-

erant proscription. It is unlawful to sell intoxicating liquors, to keep them for sale, or with intent to sell, or to keep them at all (§ 1), they are declared a public nuisance (§ 25), and not only by that declaration, but by another express provision all legal protection is withdrawn from them (§ 16). If the owner attempts to sell them he can maintain no action for the price, and if they are taken from him by force or fraud he is remediless (§ 16). In other parts of the act special provisions are contained for seizure, judicial condemnation and destruction (§ 5, 6, 7, 8, 9, 10, 11, 12, 13). But the act by no means waits for the operation of this machinery. Itself pronounces the sentence of condemnation, and the judicial machinery, such as it is, which it provides, are agencies merely to ensure the execution of the sentence. Property is lost, before the police are in motion, and I may add crime is committed without an act or even an intention. On the day the law took effect, it was criminal to be in possession of intoxicating liquors, however innocently acquired the day before. It was criminal to sell them, and under the law, therefore, no alternative was left to the owner but their immediate destruction (vide § 4).

It will be seen, therefore, that aside from the exceptional cases which have been stated, and as a beverage without exception, intoxicating liquors are laid under the ban of absolute and unqualified condemnation. As property they are stripped of the fundamental attribute of sale, and their commercial value thus annihilated. They are moreover devoted to physical destruction. Special agencies for destruction are provided, but before these are set in motion, the law itself condemns them as property in a series of provisions entirely free from ambiguity or doubt. It was said on the argument that notwithstanding the sweeping prohibitions of sale, the owner might still keep them, and even export them, and so effect a total or partial saving of his property. If this were so, I do not see how it would affect the question under consideration. If laws contrived for the destruction of property within the state are unconstitutional and void, they can not be upheld, even though

Wynehamer v. The People.

special leave be given to the owner to remove it from the state, and so place it beyond the reach of those laws. But the suggestion is founded in a misapprehension of the act. From the instant it took effect, intoxicating liquors could not lawfully be kept a single hour with a view to exportation, or kept at all, except for the special purposes of medicine, the sacrament, or for mechanical or chemical uses. It might be smuggled away, but that would not be the fault of the law. It would be quite as logical to say that an act to deprive a man of his liberty or life, without a trial, is constitutional, because there is a possibility that he may run away and thus escape.

There are many provisions of this act which were reviewed at length on the argument, and which might now receive a more particular notice. But the summary exposition which has been given, is enough for our present purpose. Proceeding upon the admitted hypothésis that the subject thus denounced and proscribed, is property, and like other property essentially inviolable, the inquiry will remain whether the constitution does not expressly prohibit such legislation?

It has been urged upon us that the power of the legislature is restricted, not only by the express provisions of the written constitution, but by limitations implied from the nature and form of our government; that aside from all special restrictions, the right to enact such laws is not among the delegated powers of the legislature, and that the act in question is void, as against the fundamental principles of liberty, and against common reason and natural rights. High authority, certainly, has been cited to show, that laws which, although not specially prohibited by written constitutions, are repugnant to reason, and subvert clearly vested rights, are invalid, and must so be declared by the judiciary.

In *Calder and wife* v. *Bull* (3 *Dallas*, 386) Judge Chase said: " I can not subscribe to the omnipotence of a state legislature or that it is absolute and without control, although its authority should not be restrained by the constitution or fundamental law of the state. The nature and ends of legislative power will limit the exercise of it. This fundamental princi-

ple flows from the very nature of our free republican governments, that no man should be compelled to do what the laws do not require, *nor refrain from acts which the laws permit.* There are acts which the federal or state legislature can not do without exceeding their authority. There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by positive law, or to take away that security for personal liberty or private property for the protection whereof government was established. * * * A few instances will suffice to explain what I mean. A law that punishes a citizen for an innocent action, or in other words, for an act which when done was in violation of no existing law, *a law which destroys or impairs the lawful private contracts of citizens,* a law that makes a man a judge in his own case, *a law that takes property from A and gives it to B.* It is against all reason and justice for a people to entrust a legislature with such powers, and therefore it can not be presumed that they have done it. *The legislature can not change innocence into guilt or punish innocence as a crime, or violate the right of antecedent lawful private contract, or the right of private property.*"

Chief Justice Marshall said, in *Fletcher* v. *Peck,* (6 *Cranch,* 135): " It may well be doubted whether the nature of society and of government does not prescribe some limits to the legislative power, and if any be prescribed, where are they to be found, *if the property of an individual fairly and honestly acquired may be seized without compensation?*" See also, *Dash* v. *Van Vleck,* (7 *John.* 477;) *Taylor* v. *Porter,* (4 *Hill,* 146; *per Bronson, J.;*) *Goshen* v. *Stonington,* (4 *Conn.,* 225; *Hosmer, J.*)

I entertain no doubt that, aside from the special limitations of the constitution, the legislature can not exercise powers which are in their nature essentially judicial or executive. These, are, by the constitution, distributed to other departments of the government. It is only the "legislative power" which is vested in the senate and assembly. But where the constitution

Wynehamer v. The People.

is silent, and there is no clear usurpation of the powers distributed to other departments, I think there would be great difficulty and great danger in attempting to define the limits of this power. Chief Justice Marshall said, (*Fletcher* v. *Peck*, *supra*) " How far the power of giving the law may involve every other power in cases where the constitution is silent, never has been and perhaps never can be definitely stated." That very eminent judge felt the difficulty, but the danger was less apparent then than it is now, when theories alleged to be founded in natural reason or inalienable rights, but subversive of the just and necessary powers of government, attract the belief of considerable classes of men, and when too much reverence for government and law is certainly among the least of the perils to which our institutions are exposed. I am reluctant to enter upon this field of inquiry, satisfied as I am, that no rule can be laid down in terms which may not contain the germ of great mischief to society, by giving to private opinion and speculation a license to oppose themselves to the just and legitimate powers of government.

Nor is it necessary to push our inquiries in the direction indicated. There is no process of reasoning by which it can be demonstrated that the act " to prevent intemperance, pauperism and crime " is void upon principles and theories outside of the constitution, which will not also, and by an easier induction, bring it in direct conflict with the constitution itself.

I am brought, therefore, to a more particular consideration of the limitations of power contained in the fundamental law, " No member of this state shall be disfranchised or deprived of any of the rights and privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers. No person shall be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation." These provisions have been incorporated, in substance, into all our state constitutions. They are simple and comprehensive in themselves and I do not perceive that they derive any additional force or meaning by tracing their origin to *magna charta* and the later

fundamental statutes of Great Britain. In *magna charta* they were wrested from the king as restraints upon the power of the crown. With us they are imposed by the people as restraints upon the power of the legislature.

No doubt, it seems to me, can be admitted of the meaning of these provisions. To say as has been suggested, that the law of the land, or, " due process of law " may mean the very act of legislation which deprives the citizen of his rights, privileges, or property, leads to a simple absurdity. The constitutution would then mean that no person shall be deprived of his property or rights unless the legislature shall pass a law to effectuate the wrong, and this would be throwing the restraint entirely away. The true interpretation of these constitutional phrases is that where rights are acquired by the citizen under the existing law, there is no power in any branch of the government to take them away, but where they are held contrary to the existing law or are forfeited by its violation, then they may be taken from him, not by an act of the legislature, but in the due administration of the law itself before the judicial tribunals of the state. The cause or occasion for depriving the citizen of his supposed rights must be found in the law as it is, or at least it can not be *created* by a legislative act which aims at their destruction. Where rights of property are admitted to exist, the legislature can not say they shall exist no longer, nor will it make any difference although a process and a tribunal are appointed to execute the sentence. If this is " the law of the land " and " due process of law " within the meaning of the constitution, then the legislature is omnipotent. It may under the same interpretation pass a law to take away liberty or life without a preexisting cause, appointing judicial and executive agencies to execute its will. Property is placed by the constitution in the same category with liberty and life.

Clear as this matter stands upon principle, it is equally well settled by authority. Chief Justice Gibson, of Pennsylvania, speaking of a similar clause in the constitution of that state, and of the right of property as protected by it, said: " What law? Undoubtedly a pre-existing rule of conduct, not an *ex-*

*post facto* rescript or decree made for the occasion. The design of the convention was to exclude arbitrary power from every branch of the government, and there would be no exclusion of it if such rescripts or decrees were to take effect in the *form of a statute*. The right of property has no foundation or security but the law; and when the legislature shall successfully attempt to overturn it, even in a single instance, the liberty of the citizen is no more." (*Norman* v. *Heist*, 5 *Watts & Serg.*, 193). And Chief Justice Bronson, of this state, in *Taylor* v. *Porter*, (4 *Denio*, 145) said: "·The words ' law of the land,' as here used, do not mean a statute passed for the purpose of working the wrong. That. construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense." And again: " The meaning of the section then seems to be that no member of the state shall be disfranchised of any of his rights and privileges unless the matter be adjudged against him upon trial had according to the course of the common law. It must be ascertained judicially, that he has forfeited his privileges, or that some one else has a superior title to the property he possesses before either of them can be taken from him. It can not be done by mere legislation." Again he adds, speaking of the words " due process of law," " if the legislature can take the property of A and give it to B, they can take A himself, and either shut him up in prison, or put him to death. But none of these things can be done by mere legislation."

Chief Justice Ruffin, of North Carolina, in a very able and elaborate judgment, involving the construction and force of a similar clause in the constitution of that state, laid down the doctrine that the terms " law of the land," do not mean merely an act of the general assembly. If they did, every restriction upon the legislative authority would be at once abrogated. " In reference," he adds, " to the infliction of punishment and divesting of the rights of property, it has been repeatedly held in this state, and, it is believed in every state in the union, that there are limitations upon the legislative power notwithstand-

ing those words, and that the clause itself means that such legislative acts as profess in themselves directly to panish persons or to deprive the citizen of his property without trial before the judicial tribunals, and a decision upon the matter of right, as determined by the laws under which it vested according to the course, mode and usages of the common law, as derived from our forefathers, are not effectually ' laws of the land,' for 'those purposes. (*Hoke* v. *Henderson*, 4 *Dev.* 18.)   Chancellor Kent, (2 *Comm.* 13;) says: " the words, ' law of the land,' as used originally used in *magna charta*, in reference to this subject, are understood to mean due process of law, that is by indictment or presentment of good and lawful men; and this, says Lord Coke, is the true sense and exposition of those words.   The better and larger definition of *due process* of law, is that it means law in its *regular course of administration through courts of justice*."   See also 3 *Story on the Const.* 661; 10 *Yerger*; 2 *Coke Inst.* 45–50.

It is plain, therefore, both upon principle and authority, that these constitutional safeguards in all cases require a judicial investigation, not to be governed by a law specially enacted to take away and destroy existing rights, but confined to the question whether under the preexisting rule of conduct the right in controversy has been lawfully acquired and is lawfully possessed.   A proposition so obvious would have deserved less consideration if a singular misapprehension in regard to it did not appear to have prevailed in a decision not now before us for review, but upon the act under examination, pronounced in another branch of the Supreme Court. (*People* v. *Quant*, *in the 4th district.*)

We are brought then directly to the question, does the act " to prevent intemperance, pauperism and crime," in a just constitutional sense, deprive the citizens of this state of their property in intoxicating liquors?   We have already seen that this species of property is just as inviolable as any other. That by the operation of this law, the commercial value is annihilated, that it can not be sold, that it is unlawful to keep it, that all legal protection is withdrawn from it, and that it

becomes a public nuisance. Is the owner " deprived " of it within the fair meaning of the constitution? I bring the act to this particular test, because if it can stand with this clause of the constitution, it can with every other.

Now, I can form no notion of property which does not include the essential characteristics and attributes with which it is clothed by the laws of society. In a state of nature, property did not exist at all. " Every man might then take to his use what he pleased, and retain it if he had sufficient power; but where men entered into society, and industry, arts and sciences were introduced, property was gained by various means, for the securing whereof, proper laws were ordained." (*Tomlyn's Law Dic.*, *Property*; 2 *Bl. Comm.* 3, 4.) Material objects, therefore, are property, in the true sense, because they are impressed by the laws and usages of society with certain qualities, among which are fundamentally the right of the occupant or owner to use and enjoy them exclusively, and his absolute power to sell and dispose of them; and as property consists in the artificial impression of these qualities upon material things, so whatever removes the impression, destroys the notion of property, although the things themselves may remain physically untouched.

Nor can I find any definition of property which does not include the power of disposition and sale, as well as the right of private use and enjoyment. Thus Blackstone says, (1 *Comm.* 138,) " The third absolute right of every Englishman is that of property, which consists in the free use, enjoyment and *disposal* of all his acquisitions, without any control or diminution, save only by the laws of the land." Chancellor Kent says, (*2 Comm.* 110,) " The exclusive right of using and *transferring* property, follows as a natural consequence from the perception and admission of the right itself." And again, (p. 320) " The power of *alienation of property* is a necessary incident to the right, and was dictated by mutual convenience and mutual wants." By another author property is defined as an " exclusive right to things, containing not only a right to use those things, but a right to dispose of them, either by exchanging

them for other things, or giving them away to any other person without consideration, or even throwing them away." (*Bouvier Law Dic. tit. Property.*) These definitions are in accordance with the general sense of mankind. Indeed, if any one can define property eliminated of its attributes, incapable of sale, and placed without the protection of law, it were well that the attempt should be made.

The statute under consideration, without reference to its provisions for the seizure and physical destruction of intoxicating liquors, by force of its prohibitions alone, sweeps them from the commerce of the state, and thus annihilates the quality of sale which makes them valuable to the owner. This is destructive of the notion of property. I need, perhaps, take no further notice of their qualified vendibility for the sacrament and the other special uses named in the act. These are only the occasional and incidental uses of the article. It is the general and primary use which is aimed at. It is the mass of property which is struck down, and the possible conservation of an extremely insignificant portion, can not change the character of the law.

No ingenuous advocate of the law will deny that its great characteristic is prohibition, intended to turn back from the channels of commerce important masses of property; and thus, by suppressing the use to prevent the abuse. To regard the act in any other light would be a fraud upon its entire policy, and upon the views and motives in which it must be supposed to have had its origin. And in order to a full view of the spirit and intent of the law, to simple prohibition, we must add its penalties and its other connected and dependent clauses, the whole forming one scheme, and all tending with fatal accuracy to the destruction of property in intoxicating liquors within this state.

Unless, therefore, the right of property in liquors is denied altogether, and this has never been done, or unless they can be distinguished from every other species of property, and this has not been attempted, the act can not stand consistently with the constitution. The provisions of the constitution should receive

a beneficent and liberal interpretation where the fundamental rights of the citizen are concerned. But in the case before us, its plain and obvious meaning is enough. " No person can be deprived of his property without due process of law " by the legislature or any other power of the government. When a law annihilates the value of property and strips it of its attributes, by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the spirit of a constitutional provision intended expressly to shield private rights from the exercise of arbitrary power.

I have not reached this result without an attentive examination of the arguments which have been urged in favor of an opposite conclusion. Such of them as may appear to have most weight, or to have been most relied on, may here be noticed.

Prominent among these suggestions our attention has been directed to a supposed analogy between the act under consideration and the license and excise laws of this and other states, the constitutionality of which is not questioned. I think the analogy does not exist. However difficult it may be to define, with accuracy and precision, the line of separation, there is a broad and perfectly intelligible distinction between what is plainly regulation on the one side, and plainly prohibition on the other. In another case great difficulty may attend the inquiry, but no greater certainly than often attends judicial investigations. The inquiry is essentially judicial in its nature, and whenever a case of difficulty arises it must be met and determined upon its special circumstances and by the aid of such light as can be obtained. In the present case the difficulty suggested is not perceived. The statute we are examining passes the utmost limit of regulation, and does not even wear a disguise. It is plainly prohibitory in every feature and in its entire scope and policy. Some of the excise acts referred to were of great stringency, considered as regulations merely of traffic in intoxicating liquors, but none of them totally prohibited their sale as a beverage, or denied to them as such the

essential qualities of property, or placed them without the protection of the laws.

It is certain that the legislature can not totally annihilate commerce in any species of property and so condemn the property itself to extinction. It is equally certain that the legislature can regulate trade in property of all kinds. Neither of these propositions is denied; but they necessarily lead to another, that between regulation and destruction there is somewhere, however difficult to define with precision, a line of separation. All reasoning, therefore, in favor of upholding legislation which belongs to one class, because it is often difficult to distinguish it from that which belongs to the other, must be fallacious, because it is simply reasoning against admitted conclusions.

The provision in the federal constitution declaring that no state shall pass laws impairing the obligation of contracts, and the course of judicial decision under that provision, may be referred to as illustrating the distinction between legislation which is remedial merely, and that which is subversive of the rights intended to be saved. Under this provision the constitutionality of state laws has often been examined, and the difficulty of distinguishing between statutes which regulated the remedy and those which impaired or subverted the right has been great and acknowledged. But the distinction itself has been steadily maintained. Neither the federal nor the state courts have ever shrunk from the inquiry; and laws which transcended the limits of regulation merely, and directly or indirectly invaded the right, have been uniformly adjudged to be void.

Nor could we escape the kindred inquiry in the case before us, although it were attended with much greater difficulty than we believe it to be: Does the statute under consideration simply regulate or does it destroy an admitted species of property in which millions of value are invested? As this question is answered the act must stand or fall, and in our judgment but one answer can be given.

Besides the license and excise laws, our attention has been

Wynehamer. *v.* The People.

drawn to other legislative enactments, producing in their result great injury to private property, the constitutionality of which has been admitted or adjudged. The embargo act of congress in 1807, (2 *Statutes at Large*, 451,) is mentioned as one of these examples of legislation. I do not perceive any analogy which can influence the present question. That was an act which simply prevented " all ships and vessels in ports and places within the limits or jurisdiction of the United States," from sailing upon any enterprise of *foreign* commerce. It is not important to inquire under what particular clause of the federal constitution the power was derived to enact such a law. That it went to the utmost verge of constitutional power has been universally conceded. (3 *Story on the Constitution,* 163.) It is enough for the present purpose to say that it was recommended and adopted as a measure of *protection* to property and not of annihilation. In the language of Justice Story, (*id.* 161,) " it was avowedly recommended as a measure of safety for our vessels, our seamen and our merchandise from the threatening dangers from the belligerent powers of Europe." In other words, it was an act of conservation, and not of destruction; although, in its effect, it bore with great severity upon the interests of the commercial states, and upon the property of individuals. It did not aim at the extinction of any species of property, or of any of its attributes. If congress, proceeding upon a theory that all foreign commerce was injurious to the interests of the nation and the morals and habits of the people, had passed an act intended to destroy it perpetually, and for that purpose, confiscating ships and vessels, prohibiting their sale, making it unlawful to keep them with intent to sell, or keep them at all, and declaring them a nuisance, and such a law had been adjudged valid, then, and I think not till then, an analogy might be traced having something to do with the question before us.

Statutes conferring upon municipal corporations powers, which, in their execution and ultimate result, inflict incidental or consequential injury upon the property of individuals, injury for which it is said the law affords no remedy, have been

adjudged constitutional. In legislation of this kind, it is also supposed some warrant can be found for the act under consideration. Here, again, the analogy fails. Laws of this character proscribe no species of property. They may injure it in their remote and accidental result, but they do not, like this act, say it shall not be allowed to exist at all, or strike directly at the qualities and attributes, without which it can have no legal existence. The constitutional requirement is, that no person shall be *deprived of his property,* and that private property shall not be taken for public use without just compensation. It is nowhere declared, that in the exercise of the admitted functions of government, private property may not receive remote and consequent injury without compensation. (*See Radcliff's Executors* v. *The Mayor of Brooklyn,* 4 *Comst.* 175.)

The authorized destruction of buildings in the city of New York by direction of the mayor and aldermen, in order to prevent the spread of a conflagration, (see 2 *R. L.* of 1813, p. 368, §81,) has been referred to as a constitutional exercise of legislative power which deprives a citizen of his property. It is enough to say of such statutes that they are founded upon and are mere regulations of the common law right of any person to destroy property in a case of immediate and overwhelming necessity to prevent the ravages of fire or pestilence, (2 *Kent. Comm.* 339; *Russell* v. *The Mayor, &c., of New York,* 2 *Denio,* 461; 17 *Wend.* 285; 25 *id.* 157.) Statutes of this description merely appoint a municipal agent to judge of the emergency, and direct the performance of acts which any individual might do at his peril without any statutes at all. If such legislation can prove any thing to the present purpose, it would show that these powers of destruction may be invoked in order to reform the morals and habits of society, and therefore that authorized agents of the legislature, or individuals without authority, may go forth on a roving commission to seize and destroy all intoxicating liquors within the borders of the state, and plead an overruling necessity as a justification of their lawless acts. This would be a mission which phi-

Wynehamer *v.* The People.

lanthropists and reformers have not yet undertaken, and certainly which no judge or lawyer would defend.

Other examples of legislation have been cited which may be grouped together and considered at a single view: laws of quarantine, which detain ships for a limited period, coming from places where pestilential diseases exist; laws against smuggling, which forfeit the goods and the vessels in which they are conveyed for nonpayment of impost duties; laws against gambling, which forfeit the tools and implements with which the offence is committed; laws against horse racing, under which it is said the horses unlawfully used are forfeited; laws against selling liquors to Indians, under which the liquors themselves may be forfeited. Examples of this sort are supposed to have a peculiar application to the question, because by the force of statutes of admitted validity, property is specifically forfeited, and so the owner deprived of it. There is, however, a fallacy in all reasoning and illustration from such sources, which can be readily exposed.

And the precise and fatal difficulty in the argument is that the only resemblance between the statutes referred to, and the one under consideration is in the *character of the punishment* The prohibitions themselves are totally unlike, and relate mostly to different subjects. That the punishment for violating such prohibitions is similar, or even the same, amounts to nothing, when the question is whether the prohibitions themselves, or any one of them, is constitutional or valid. Take for example, the instance of smuggling. No one doubts the power of congress to prohibit the importation of goods without the payment of duties, nor consequently that the offender may be punished by a forfeiture of the goods, by pecuniary fine or imprisonment. But whether the legislature of this state has power to prohibit the keeping or sale of property in general, or any particular species, is the precise question now to be determined. When that is first established, then the owner who violates the prohibition may lose his property, or be fined, imprisoned, banished or put to death. It is certainly a simple

proposition than an admitted public offence against a constitutional statute may be punished by loss of property, of money, of liberty or of life; but how this tends to show that another statute prohibiting things of a totally different character, and similar only in its sanction or penalty, is valid, and the offence itself constitutionally created, is what I have been unable to perceive. In a word, to trace an analogy between two statutes in the manner of enforcing them or punishing the offender, does not advance a step toward proving that either the one or the other is constitutional or the contrary.

The illustration from the statutes referred to, and all others which can be referred to, fails for another reason of great significance, which seems to have been overlooked by those who assert the validity of the prohibitory law. It is an entire misconception of the law itself to say that the species of property to which it relates is *forfeited for a violation* of its provisions. It is simply *extinguished* by the force of the prohibitions themselves. In other parts of the act pecuniary penalties and imprisonment are inflicted, but the loss of property is not exacted as a forfeiture at all in any just or ordinary sense of the term. It is quite absurd to say of a law which enacts in substance, that property of a particular species shall no longer exist, that it imposes a forfeiture of such property as the punishment for violating the prohibition. There is no offence except the misfortune of being the owner. A forfeiture of goods implies a title to them, good against all the world, but if this law is valid, then the owner has no title to lose. Analogies for such legislation will be sought for in vain.

In respect to one of the statutes which have been mentioned, that which prohibits the sale of intoxicating liquors to Indians, it should be further observed, that Indians are considered as persons *inops consilii* under the tutelage of government and in the same catagory with minors, habitual drunkards, &c. These classes of persons are especially the subjects of governmental care, and to concede that the legislature may restrain or prohibit the sale of spirituous liquors to them, is only admitting that it may regulate traffic in any species of property; an ad-

Wynehamer *v.* The People.

mission which suggests the distinction already sufficiently considered between the power to regulate and the power to destroy.

It has been said also, that the admitted power of taxation may be so exercised under legislative authority as greatly to impair the value of private property. This is undoubtedly true, but it throws no light upon the present question. The power may be wisely or unwisely, justly or unjustly exercised, but as a power it rests upon the theory, that full compensation is received by the individual in the benefit conferred by the tax itself. The support of government, and other objects of public utility promoted by taxation, are supposed to return to the individual the value which has been taken from him as his share of the public burthen. This is neither depriving a man of his property in the constitutional sense, nor taking it for public use under the right of eminent domain.

Again, it may be suggested, if in a given case it could be plainly seen that the confiscation and extinction of a species of property were the essential object of a statute, it should be declared unconstitutional although disguised under the forms of taxation.

It has also been supposed that some authority for legislation of this kind is found in the observation of one or two of the judges of the Supreme Court of the United States, delivered when the license laws of Massachusetts, Rhode Island and New Hampshire were examined in that court (5 *Howard*, 504). This is quite a mistake. The question involved and determined was that the excise laws of those states did not conflict with the authority of congress to regulate commerce with foreign countries, and among the states. Whatever was said beyond that was of course *obiter dicta* merely, and even as such had no reference to the limitations of legislative power contained in state constitutions.

It is scarcely necessary perhaps to observe, that in the views which have been expressed, it is not intended to narrow the field of legislative discretion, in regulating and controlling the traffic in intoxicating liquors. We only say that in all such

legislation, the essential right of the citizen to his property must be preserved, a right which includes the power of disposition and sale, to be exercised under such restraints as a just regard, both to the public good and private rights may suggest.

I am not insensible to the delicacy and importance of the duty we assume in overruling an act of the legislature, believed by so many intelligent and good men to afford the best remedy for great and admitted evils in society. But we can not forget that the highest function entrusted to us is that of maintaining inflexibly the fundamental law; and believing, as I do, that the prohibitory act transcends the constitutional limits of the legislative power, it must be adjudged to be void. The judgments of the Supreme Court and of the Court of Sessions must therefore be reversed.

Judges *Denio, A. S. Johnson, Selden* and *Hubbard* concurred.

Judges *T. A. Johnson, Wright* and *Mitchell* dissented.

Judges *T. A. Johnson* and *Wright* delivered the following opinions:

T. A. JOHNSON; J.—The plaintiff in error was indicted by a grand jury of Erie county, charged with having sold intoxicating liquor in small quantities, contrary to the provisions of the prohibitory act of April 9th, 1855, and was tried and convicted of the offence, at a Court of Sessions. It was proved upon the trial, that he had on several occasions, between the 4th of July of that year, and the time of the indictment, sold and delivered at his bar, in Buffalo, to various persons, brandy in quantities less than one pint, which was drank upon his premises. As the plaintiff in error had no license to sell, in that manner, and for that purpose, the acts proved, were such as have been misdemeanors in this state, by statute, subjecting the offender to indictment and conviction, in the manner adopted in this case, certainly ever since the excise act of

1801, up to the time when the act in question took effect. It is to be seen, therefore, whether such acts are still criminal in their character, or whether, under the present statute, the criminal feature, so long and uniformly stamped upon them, hitherto, has been taken away.

The indictment is for selling contrary to the provisions of this act, and not to the provisions of the Revised Statutes, and unless this act has been violated, the conviction in any view is erroneous.

Only two questions properly arise in this case: First, Was the liquor so sold by the plaintiff in error, subject to the prohibition in the first section of the act? And second, Has the legislature power to enact a valid law, to prohibit the traffic in intoxicating liquors, to the extent to which prohibition is sought to be carried by the act in question?

The ground upon which it is claimed that the liquor in question, and consequently the act of selling, was exempt from the operation of the act, is, that it was liquor which was imported from a foreign country, in pursuance of the laws and treaties of the United States, and the duty regularly paid upon it by the importer. That the plaintiff in error purchased it from the importer, in the original package, and drew it from such package when it was sold as complained of. These facts, which the plaintiff in error offered to prove on the trial, were admitted on the part of the public prosecutor; but the evidence was objected to on the ground that it was irrelevant and immaterial, and the evidence and the consideration of the facts conceded, were excluded by the court on that ground. Under these circumstances was this liquor subject to the prohibition in the act, at the time of the sales in question, or was it exempt? The last clause of the first section is as follows: "This section shall not apply to liquor, the right to sell which, in this state, is given by any law or treaty of the United States."

Doubtless the first section did not apply to that liquor while in the hands of the importer and before he had sold it, assuming the facts, as they were admitted to exist. But did the exemption which thus far attached, follow it into the hands of

the plaintiff in error, so as to authorize sales by him. Is that the meaning of the provision? This must depend, I think, upon the question whether the laws or treaties of the United States follow property imported from foreign countries, after it has passed from the hands of the importer to citizens of this state and confer any rights or privileges upon it, which do not attach to other property in this state, not imported.

If they do not, the terms of the exception do not apply the right to sell, at the time and in the manner, was not given by any law or treaty of the United States. That these laws and treaties do not thus follow property after it has passed from the hands of the importer, and become part of the mass of property in the state, is conclusively established. (*Brown* v. *The State of Maryland*, 12 *Wheat.* 419; *License Cases*, 4 *How.* 504.)

The obvious design of the provision was not to confer any privilege or give any exclusive right to foreign over domestic liquor, but simply to avoid all collision between state and federal authority. The exemption continues while the right continues. But, where the article has passed from under federal jurisdiction, and no right from that source is any longer given, the exemption ceases. The right must be given at the time of the sale, or the liquor sold, is not exempt.

This is, I think, the plain reading of the clause, and that such was the intention of the legislature, no one can reasonably doubt. If we could ignore the whole scope and spirit of the act, and exclude from view its design as declared upon its face, and look only to the wording of the clause, we might give the construction to it contended for by the learned counsel for the plaintiff in error. But this would violate all rules for the interpretation of statutes. If the language is susceptible of interpretation in harmony with the declared object of an enactment, courts are bound to give it that interpretation.

They can only give a construction which will convict the legislator of absurdity or folly, in cases where the language employed is so clear as to leave no alternative.

Without stopping, therefore, to inquire whether there is any existing law or treaty, which had at some time, and under other

circumstances given another person the right to sell the liquor in question, it is clear that neither could have conferred any right upon the plaintiff to make the sales of which he was convicted, and the exception does not help him.

The question then arises, whether the legislature has power to make a valid law prohibiting the sale of property of this description, for the purposes for which it had been before most commonly purchased. It is a question of power simply, and leads to an inquiry, first, into the nature and extent of the law-making power in a state government within the United States.

Each state is, undoubtedly, a complete and perfect sovereignty in itself, in all cases and in respect to all matters in which powers naturally pertaining to states as sovereignties, have not, by express grant or by necessary implication, been conferred upon the general government.

In respect to the powers conferred upon the general government by the constitution of the United States, the states are subordinate powers, and can enact no valid laws in conflict with that constitution, or with laws constitutionally enacted by congress, or treaties made under the proper authority.

The position is assumed by the learned counsel for the plaintiff in error, that any law of a state limiting and restricting or prohibiting sales of imported property, by the immediate or remote purchaser from the importer, inasmuch as it might, and naturally would, tend to discourage and prevent importation, is in derogation of the authority of the general government, under which importations are authorized, and therefore void. But the conflict of authority between the two jurisdictions has never been carried to this extent, and the law in this respect is decisively settled the other way in the case above cited. Chief Justice Taney, in his opinion in the license cases, says:

" These state laws act altogether upon the retail or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce and become part of the general mass of property in the state. These laws may indeed discourage imports and diminish the price

which ardent spirits would otherwise bring. But although a state is bound to receive and to permit the sale, by the importer, of any article of merchandise which congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law which it may deem necessary or advisable to guard the health or morals of its citizens, although such law may discourage importations or diminish the profits of the importer, or lessen the revenue of the general government.

"And if any state deems the retail and internal traffic in ardent spirits injurious to its citizens, and calculated to produce idleness, vice, or debauchery,'I see nothing in the constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether, if it thinks proper."

The doctrine contended for, if well founded, would deprive the state of all power to regulate the use or transfer of such property or to tax it, and tend to the subversion of all state government.

It is claimed also, that the act in question impairs the obligation of contracts, and is, therefore, in conflict with the constitution of the United States.

It is difficult to see, however, how this act impairs the obligation of any contract which was in force when the act took effect, or what possible bearing it can have upon such contracts.

The case must undoubtedly rest upon the question of legislative power, under the state constitution, irrespective of all questions of federal authority. The power to make general laws is necessarily and inherently sovereign power. The first idea of a law, obliging to acts, or forbearance of acts, involves the idea of sovereignty as to its origin. With us this power is lodged by the constitution, with the senate and assembly, and it exists in those bodies as fully as it did or could exist in the sovereign people, by whom the constitution was made, except in those cases where its exercise is limited and restricted by some express or clearly implied limitation in the instrument itself.

Where the power is limited, it can only be exercised subject to, and in accordance with, the limitation. In those cases it is a limited sovereignty.

But where the constitution imposes no restriction, and the power sought to be exercised is not possessed by the general government, it exists without restriction. The only limitation, then, for aught I can see, is the discretion of those who possess and are appointed to use it, within the boundaries of human action or capacity. And whether the constitution is to be regarded as a grant of the power, or the mere recognition and acknowledgment of its existence as inherent in those bodies, the result is the same. For if a grant it is plenary, and carries the entire legislative power, the power to make laws for the government of the state, to be enforced upon those who granted it. However derived it is a superior power, sovereign in its nature, and the rules, which apply to mere delegated and secondary powers, do not apply to it.

Clothed with this power, the corresponding duty necessarily devolves upon the legislature of determining what acts are compatible with the safety and welfare of all classes of citizens, and what not; and what acts are so far prejudicial and injurious as to become criminal; such acts it may declare criminal, and forbid, and fix the grade of the crime and the appropriate measure of punishment. Some criminal acts it punishes with the forfeiture of life, some with that of liberty and all civil and political rights, others with the forfeiture of property, and the infliction of penalties only.

It authorizes the real and personal property of one person, without his consent and against his will, to be alienated and transferred to another in satisfaction of obligations unperformed and promises broken. It levies contributions in the form of taxes upon every man's property for the support of government, and to make improvements conducive to the general convenience and prosperity.

All this is but the common, ordinary exercise of legislative power. One of its first and clearest duties is to make all necessary laws, to remedy existing and admitted evils, and to

prevent their recurrence. And of this character, and for this object, is the statute in question.

That intemperance, pauperism and crime are evils, with which the government is necessarily compelled to deal, none will deny.

In the judgment of the legislative bodies by which the statute was enacted, one great source of all great, oppressive and dangerous evils was the traffic in intoxicating liquors. So injurious in their opinion has this traffic become, under existing restrictions, in its consequences upon the community, that it ought to be subjected to still more rigorous and extensive restrictions and prohibitions, and impressed with additional features of criminality.

If the legislature had the power to enact a law to accomplish this end, the right to choose the means best calculated to effect it was necessarily vested in it, unless indeed the use of such means is forbidden by the constitution.

And this is the point apparently most relied upon by the learned counsel for the plaintiff in error. The position is that no traffic in any article which the law regards as property, however injurious it may be, can be subjected by law to such regulations and restrictions as in a great measure to destroy it without coming in conflict with that provision of section 6, art. 1 of the constitution, which declares that " no person shall be deprived of life, liberty or property without due process of law." The argument is that the value of property as an article of trade is an essential element of it as property, and that to the extent to which the restriction or prohibition diminishes its value for such purposes, to the same extent the owner is deprived of his property, although neither the title nor the possession of such owner is in any respect interfered with. And that this is accomplished by the operation of the act, independent of any trial or judgment; in other words, without due process of law.

Is not this a strained and unwarrantable construction and application of this provision of the constitution? Clearly it is. This provision has no application whatever to a case where

the market value of property is incidentally diminished by the operation of a statute passed for an entirely different object, and a purpose in itself legitimate; and which in no respect affects the title, possession, personal use, or enjoyment of the owner.

Such a construction would prohibit all regulations by the legislature, and all restrictions upon the internal trade and commerce of the state. It would place the right of traffic above every other right, and render it independent of the power of the government. "Deprived" is there used in its ordinary and popular sense, and relates simply to divesting of, forfeiting, alienating, taking away property. It applies to property in the same sense that it does to life and liberty, and no other. Prohibiting the sale of property, except under and in pursuance of a license, and for certain specified purposes, is in no sense depriving a person of it. The prohibition tends to hinder and prevent divesture, but in no respect to enforce it.

The act does indeed, by other provisions, directly provide for depriving the owner of his property by forfeiture and destruction; but that is where it is kept for an unlawful purpose, and after a trial and judgment. That provision has no bearing upon the question under consideration. When the property is taken from the owner and destroyed, he is then deprived of it by virtue of the act, not before. It might be urged with precisely the same pertinency and force, that a statute which prohibits certain vicious actions, and declares them criminal, deprives persons of their liberty, and is therefore in derogation of the constitution.

The constitutional provision referred to, was intended to protect property from confiscation by legislative enactments, and from seizure, forfeiture, and destruction, without a trial and conviction by the ordinary modes of judicial proceeding. There is no pretence that the plaintiff in error in this case was not convicted by due course and process of law.

There can be no doubt, that intoxicating liquor is property. It is a chattel, an article of use, of consumption and of commerce, and is property in the strictest legal, and constitutional

sense. But in order to show that the act, by its own inherent force, and independent of the authority it confers upon the magistrates, or the courts, deprives the owner of his property, it is necessary to insist, and we are asked to determine, that the legal property is not the article itself, but consists in some of its qualities or incidents. It is urged that the legal property is principally in its vendible quality, and consists mainly in its commercial value, in the money the owners might receive in exchange for it in the market. And that in this sense, the owner is deprived of it whenever legislation tends to lessen its current market value.

The inquiry whether the chattel in its corporeal substance, and entity, is property, or whether the legal property does not consist in some incident or right which the law confers or attaches, is one more appropriate to the schools, than the courts. Constitutions and general laws are not founded in any such subtleties, and can never be safely interpreted by them.

If we permit ourselves to depart from the obvious, general fact, that the thing is property, and enter this field of speculation, into which we are thus invited, we shall be in great danger of losing our way in its uncertain paths, and involving ourselves in the grave absurdity of holding that a statute which forbids a person selling an article of use and consumption, and renders it necessary for him to keep it for his own use, and consumption, instead of selling it to others, to be used or consumed by them, really takes it away from him, and deprives him of it, contrary to the constitution.

It will be found impossible for this court, extensive and final as its authority is, to make a proposition true in law, which is so essentially, and palpably, untrue in fact.

But should we adopt the fallacy, that the exchangeable value of the chattel is the legal property; and that this is what the constitution was designed to protect, how would that affect the statute in this case? There is nothing in the terms of the act on the subject of value, or price, and the fact, if it be one, that its operation has been to reduce the price or market value of liquors, is the subject of evidence and must be established

by proof. There is not a word of proof upon the subject, in the case, one way or the other. It is not a fact of which we can take judicial notice, for the courts without evidence, can not see whether the tendency of the act has been, or will be, to enhance or to diminish the value of the stocks on hand when the act took effect. Certainly it is no truism, either in law or in political economy, that a restriction upon the sale of an article, diminishes its exchangeable value under all circumstances. If it may be still sold for some purposes, the result may well be to enhance the value. That would depend in a great degree upon the future supply. But for this court to assume the fact that the act has had, or that it will have, the effect to reduce or destroy the market prices or value of the article as the basis of its action, without any evidence whatever to support it, and proceed to declare the statute void on that ground, would be a proceeding without precedent or parallel in judicial history. It would be a mere arbitrary, judicial repeal of the statute, instead of a judgment founded on ascertained facts and the law of the land.

Even were we to go to the extraordinary and unprecedented length of holding that the government is bound to provide a market, or at least leave some market open for every noxious or deleterious article which may enter into commerce, and in which the owner has property by law, this duty has been performed in respect to liquors by the act in question. Every citizen is expressly authorized to apply for and obtain a license to sell his own liquors, for the uses and purposes permitted by the act, by complying with the conditions. And these conditions are scarcely more stringent than those imposed by the former excise laws; and besides this the right to export remains untouched.

It can not, therefore, as it seems to me, with entire candor and fairness, be contended that any single element of property has been destroyed by the act alone.

But in my judgment, the constitution has no such meaning, and is, neither in its language or spirit, susceptible of any such interpretation. It looked only to the title and possession of

the substance, and was never intended to place a restraint upon legislative power so entirely fatal to its usefulness and authority, as the construction contended for would establish.

Courts ought not certainly to extend the provisions of the constitution, by a strained construction, for the purpose of shielding and fostering a traffic, which, in the judgment of the legislature, is productive of such serious evils. The same argument would, if sound, prove all our former excise laws unconstitutional. Those laws, it is true, were confined to the retail traffic, in quantities less than five gallons. But that was the traffic from which the great majority of the consumers of the article always were, and always will be, supplied while it exists.

Every restriction upon that branch of the traffic was calculated, therefore, to affect the interests of by far the greatest number of individuals. And yet so far has the principle of restriction and prohibition, in this department of the trade, been uniformly carried heretofore, that probably not one in five hundred of the entire population of the state, has ever had the right to sell a glass of spirituous liquor, or any other quantity below five gallons, to any person or for any purpose whatever.

The exercise, of what is now claimed, as an absolute, inalienable right, to sell whatever is property, by any one, not specially authorized, has thus far, as respects this traffic, been declared and held to be a crime. Over this branch of the traffic, the government has hitherto assumed and exercised entire and exclusive authority and control. No one could engage in it at all, without a special license acknowledging the government as the source of the right. All others were rigidly excluded, and natural right, if such there be more than in name, in regard to mere traffic in property, between individuals, in a civilized and organized society, entirely extinguished. No person was entitled to a license without possessing certain prescribed, moral and other qualifications, to be certified on the face of the license. The permission, when granted, only conferred limited and partial rights and privileges, which could

not be exceeded by the holder, without the forfeiture of his privilege, and amenability to punishment for crime.

A grocer, under his license, could only sell to persons to carry away. He could not sell it, nor allow it to be drunk upon his premises. The tavern keeper, on the contrary, under his license, could not sell to a person to carry away. He could only sell to be drank in his house, or upon his premises. Very few persons could ever engage in one branch of this traffic, that of selling to be drank at the time of sale. To enable a person to obtain this species of license, he must propose to keep a tavern; the commissioners must be satisfied that he was of good moral character, and was of sufficient ability to keep an inn, or tavern; that he had the necessary accommodations to entertain travelers, and that a tavern was absolutely necessary for the actual accommodation of travelers, at the place where it was to be kept. In addition to all this, he was required to give a bond to keep an orderly house, and not to suffer certain practices in it. If he trusted any one for liquor, more than the sum of one dollar and twenty-five cents, unless he was actually a lodger in his house, or a traveler, not residing in the same city or town, he could not recover it by action. All securities taken for it were void, and he was liable to forfeit double the amount thus attempted to be secured. All persons (those having a license as well as others,) were absolutely prohibited from selling or giving away, any quantity to an Indian in this state, or to a person designated and described, by the overseer of the poor of a town, as an habitual drunkard, after notice served by such overseer, or by any clerk, agent, or member of the family of the person thus designated.

In short, it will be seen that in nothing has the power of the government been more uniformly and steadily exercised, from the beginning, than in hedging about and placing guards, restrictions and prohibitions upon the traffic in intoxicating liquors, to the exclusion of all mere natural rights, and that too for the purpose of preventing, as far as practicable, the very evils sought to be prevented by the act in question. Con-

gress has uniformly exercised the same power in reference to the traffic in the territories of the United States.

It was admitted fully, on the argument, by the learned counsel for the plaintiff in error, that the legislature might restrict and control the traffic to the extent to which it had exercised the power before this act, and that all former acts on this subject were valid, constitutional acts.

This concession, which might well be made, in respect to the exercise of a power and the pursuit of a policy by the legislature, under every constitution from the origin of the government to the present, and which was, practiced under the colonial government for at least half a century before the revolution, seems to me to cover the whole ground of the controversy. It will be seen from the above brief summary, that the power heretofore exercised was identical, in kind, with that exercised in passing this act, and differs only in degree. The principle and policy upon which the former legislation was founded, has been extended. Nothing more. The constitution certainly creates no distinction in regard to the exercise of legislative powers between the different branches of traffic, and who shall say that the whole of any traffic is more exempt from legislative supervision and control than a part? If in the retail traffic, the legislature may constitutionally say who may sell and who may not, and for what objects and purposes, and to what class of persons sales may and may not be lawfully made, why not in the wholesale? There is no difference in principle.

" Questions of power," says Chief Justice Marshall, in *Brown* v. *State of Maryland*, " do not depend upon the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed."

The principle which will authorize the prohibition of the sale of four gallons, or any quantity less than five, in a single bargain, will authorize the prohibition of the sale of less than a hundred gallons, or a thousand, at one time, and indeed any sale whatever. The extent is a question of policy and expedi-

Wynehamer *v.* The People.

ency, not of principle. It becomes a question, not of the existence of the power, or the right to exercise it, but of the degree to which the public interests require its exercise. And this is necessarily a matter of legislative discretion, with which courts have nothing to do. It is too plain for argument that the right to sell four gallons is as sacred as the right to sell any other quantity, however large, and can be rightfully no more abridged or taken away. And the owner is no more deprived of his property in one case than in the other, except in measure and degree. If, therefore, it be conceded that former statutes on this subject were valid enactments, it is folly to contend that this act is unconstitutional, and to insist upon absolute, individual right to the transmission of property from one to another as paramount to the authority of government.

A distinction has been attempted to be drawn between the power to restrict, by way of regulation, and the power to prohibit. But this distinction, if there be one, is altogether too narrow and uncertain to serve as the test of the rightful exercise of a power, like that of making laws for the government of a state. The right to restrict and regulate includes that of prohibition.

The power to regulate is conceded, but the power to prohibit is denied. Amongst the powers conferred upon congress by the constitution of the United States, is that " to regulate commerce with foreign nations among the several states, and with the Indian tribes." Under this power to regulate it was held by the Supreme Court of the United States, in *Gibbons* v. *Ogden,* 9 *Wheat.* 1, that congress had entire and exclusive jurisdiction over the whole subject, of the commerce specified, and all its channels, agencies and incidents. In the exercise of this power to regulate, it has repeatedly passed acts far more sweeping, prohibitory and stringent in their character and operation than the act in question. It is by virtue of this authority to regulate that the embargo and non-intercourse acts, with their severe penalties, were enacted. And also the

acts prohibiting, totally, citizens of the United States from selling ardent spirits to the Indians in the territories, on pain, in case of a violation, of forfeiting not only all the liquor in the possession of the trader, but all other goods in his possession of every description. But a more conclusive answer is, that the constitution makes no such distinction, and imposes no such limitation. The constitution goes no further in this direction, than to restrain the legislature from depriving any person of his property without due process of law, leaving it free to regulate, restrict and prohibit, to any extent, short of that, required in its judgment for the public good.

This whole controversy, so far as it involves any question of principle, is narrowed down to a struggle for the right of the individual to traffic in whatever the law adjudges to be property, at his discretion, irrespective of consequences, over the right of government to control and restrict it within limits compatible with the public welfare and security.

Everything beyond this is merged in considerations of expediency. This right of the owner to traffic in his property, never was, since the institution of society, a right independent of the control of government. It is a right surrendered necessarily to the government by every one when he enters into society and becomes one of its members.

A government which does not possess the power to make all needful regulations, in respect to its internal trade and commerce, to impose such restrictions upon it, as may be deemed necessary for the good of all, and even to prohibit and suppress entirely, any particular traffic, which is found to be injurious and demoralizing in its tendencies and consequences, is no government. It must lack that essential element of sovereignty, indispensably necessary to render it capable of accomplishing the primary object for which governments are instituted, that of affording security, protection and redress to all interests, and all classes and conditions of persons within their limits.

If, therefore, the act in question was what is claimed against it, a naked prohibitory act, suppressing the traffic in this species of property altogether, which it clearly is not, the presumption

would be that it was deemed by the legislature, necessary for the public welfare, and I know of no power which could abrogate it, except that by which it was enacted.

If its validity could be made to depend in any degree upon the fact that the traffic is productive of the evils attributed to it, intemperance, pauperism and crime, a fact which is scarcely denied or questioned by any one, that fact has been established by the legislature. The conclusion of the legislature, upon this question of fact, is final and conclusive, upon all courts, and all persons, as long as the statute remains unrepealed. And the proposition that the government does not possess the power to protect itself and its citizens, to whom it owes protection as a primary and paramount duty, against the consequences of such a traffic, by prohibiting the traffic itself, is monstrous, and strikes at the very foundation of all government.

The general maxim is that the will of the legislature is the supreme law of the land, and demands perfect obedience.

Although this rule does not fully obtain here, or in any government with a written constitution, placing restrictions upon legislative power, yet, " if there be no constitutional objection to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power, under any other form of government." (1 *Kent Comm.* 441.)

It is claimed that courts independent of constitutional limitations, upon legislative power, have the right to annul statutes, and pronounce them void, whenever, in their judgment, they are in conflict with the fundamental principles of the government, and tend to individual oppression, although not in conflict with any provision of the constitution of the United States, or of the state.

I know of no such power vested in the courts, and they should never attempt to usurp it. The limitations upon legislative power are written in the fundamental law, and that is the standard by which all questions of power exercised by the legislature must be tried. To this extent the question is a legitimate one for adjudication by the courts, as the construc-

tion of the fundamental law necessarily falls within their province. Nor does this involve the philosophical absurdity, insisted upon by some writers, of the inferior power annulling the acts of the superior. Because upon our theory of government, the legislature is powerless when it attempts to pass the limits prescribed by the constitution. To this extent, under a written constitution, this power may be safely and properly exercised by the courts, and, indeed, its exercise often becomes necessary to prevent the encroachments of power, and to protect rights shielded by the constitution.

But, beyond this, such a power exercised by the courts, would be a mere veto or dispensing power. No such power is conferred by the constitution, nor does it pertain to the judicial functions.

Lord Campbell, in a recent case, (*Woodworth* v. *Watts*, 2 *E. & B.* 457; 75 *C. L. R.*) emphatically disclaims any such jurisdiction on the part of the English courts as that habitually exercised by our courts in this respect. Indeed, without a written constitution, it has no foundation to stand upon.

Should the time ever come, when the courts, instead of promptly sustaining and enforcing the legislative will, become forward to thwart and defeat it, and assume to prescribe limits to its exercise other than those prescribed in the constitution; to substitute their discretion and notions of expediency for constitutional restraints; and to declare enactments void for want of conformity to such standards; or when, to defeat unpalatable acts, they shall habitually resort to subtleties, and refinements, and strained constructions, to bring them into conflict with the constitution, the end of all just and salutary authority, judicial as well as legislative, will not be remote. When men chafing under the restraints of particular statutes, and prompted by interest, passion, appetite or partisanship to disregard them, and set their authority at defiance, once begin to expect from courts immunity and protection, instead of punishment, the judiciary will have lost, not only its claim to respect and confidence, but the power of enforcing general laws. Courts can only sustain their own authority and efficiency, by

Wynehamer *v.* The People.

vigilantly and fearlessly upholding and sustaining legislative enactments in all cases, where they are not plainly and clearly in derogation of constitutional limitations. The people have a far more certain and reliable security and protection against mere impolitic, overstringent or uncalled for legislation, than courts can ever afford, in their reserved power of changing annually and biennially, the representatives of their legislative sovereignty. And to that final and ultimate tribunal should all such errors and mistakes in legislation be referred for correction.

As there is nothing, therefore, in the constitution, either of this state or of the United States, which takes away or limits the rights of the legislature to make such regulations in regard to the traffic in property amongst the citizens of the state, and to impose such restrictions and prohibitions upon it as it shall deem necessary for the public good; this act, so far as it restricts and prohibits the sale of intoxicating drinks, must be pronounced a valid, constitutional act, and entitled to obedience from every citizen of the state.

Several other questions were discussed upon the argument, but as they have no bearing upon that portion of the act which applies to this case, it is unnecessary to notice them here.

I am accordingly of the opinion that the conviction should be affirmed.

WRIGHT, J.—1st. The defendant was indicted, tried and convicted at a court of General Sessions, for selling intoxicating liquor, in violation of the provisions of the act entitled " An act to prevent intemperance, pauperism and crime." There are but two questions in the case." 1. The power of the legislature to enact laws which shall affect the traffic in intoxicating liquors, and absolutely prohibit such traffic, if in the judgment of the lawmakers the interests of the state demand it. 2. Whether the last clause of the first section excepts from the operation of the act, imported liquors. The last is scarcely a question, as all the judges agree, that imported liquors are not excepted, unless in the hands of the importer, in the original

package, and which have not been mingled in the general mass of property of the state.

2*d.* All legislative power is vested in a senate and assembly, subject only to such limitations and restrictions on the exercise of such power as are imposed by the constitution. The making of laws is the highest exercise of sovereignty, and there is no limitation upon such exercise unless it be found in the constitution, either in express terms or by necessary implication. This position is conceded by a majority of the court. The legislature possess the power not only to regulate the traffic in a particular article of property, but to prohibit the traffic altogether. They had the power to enact the act in question unless it conflicts with some constitutional provision. This also is conceded by a majority of the court. The only question, therefore, is whether the exercise of legislative power as evinced in the prohibitory clauses of the act, conflict with any constitutional provision.

3*d.* The prohibitory clauses are not in hostility with that abstract declaration of fundamental right, viz: that no person shall be *deprived* of life, liberty or property, without due process of law. I have been at a loss to perceive how this provision can be applied in restraint of the power attempted to be exerted in the first and other sections of the act relating to prohibition, or how applying the prohibitory clauses to the touchstone of this constitutional provision, the former are void. To restrain or prohibit the sale of liquors, or even keeping them, under such restraint as the law-makers may impose, and making the sale or keeping in prohibited places, an offence, is not an enactment, within the sense of the constitutional provision, *depriving* a person of his *property* without due process of law.

This right, which is declared fundamental, was extorted by *Magna Charta.* It was originally a limitation upon arbitrary power, and as much concerned the life and liberty of the subject as his property. Indeed more, as life and liberty were more valuable than property. It secured the right that no man should be *deprived* of life, liberty or property, without judicial

investigation and judgment. This is all that it meant in *Magna Charta* or the statutes of England, and all that it means in our constitution. It is aimed at any *actual* deprivation of life, liberty or property by the direct exercise of power, whether executive or legislative, and not by any constructive deprivation, through the operation of acts to promote the public well being, or even creating offences hitherto unknown to the law.

A law, the tendency of which may be to lessen the value of a particular article of property, or even making it an offence to keep it in certain places, is not depriving one of his property within the meaning of the provision. That is not the right protected from legislative invasion. The citizen, or subject of government, is not to be deprived of life, nor liberty, nor his property, by arbitrary fines, forfeitures, confiscations, attainders or the like, without judicial sentence. This is the right secured, and all of it. The restraint upon legislative power extends no farther than that the legislature shall not enact a statute which, in the terms of the act itself, creates an offence or forfeits property, convicts the offending party, and pronounces judgment upon him without the interposition of the judicial authority of the government. I can not therefore perceive how the prohibitory clauses of this enactment are in conflict with the constitutional provision referred to; or how similar provisions applied to liquor as an article of property, would be valid as not falling within the constitutional inhibition, if such property be acquired subsequently to the act taking effect. Indeed, I can not see how the question as to when the property is acquired can effect the construction of the constitutional provision, or how an enactment may not fall within the restriction if applied to subsequent acquisitions, and does fall within it as to existing property. Would an act be valid that deprived a person of liberty subsequently acquired, and invalid as to the right to liberty existing at the passage of the act? Yet the deprivation spoken of relates as much if not more to liberty as to property.

4th. There is no other question in this case than the one

whether the prohibitory clauses of the act in question conflict with the constitutional provision referred to. I think they do not. It follows, therefore, that the legislature have power to absolutely prohibit the traffic in intoxicating liquors, or even to restrict as to the places in which it may be kept, without regard to the question as to when property in the article was acquired.

5th. The point does not arise in this case whether the constitutional provision that the trial by jury, except as heretofore used, shall remain inviolate forever, is a restraint upon the legislature against creating a court of Special Sessions to try offences under the act, and exclude the offender from the right of trial by a common law jury. It does, however, arise in the *Toynbee* case, as the party asked to give bail to appear at the General Sessions. I do not think that the section of the act empowering courts of Sessions to try offences under the act, conflicts with the constitutional provision.

6th. The question of the validity of some of the provisions for executing the act, is not in either case, such as the authority to search for and seize liquors suspected to be kept in violation of the act. I entertain great doubts whether these latter provisions can be upheld; but not for the reason that they are repugnant to the clauses of the constitution referred to, but to another clause in that instrument. It is unnecessary, however, to pass upon the question.

7th. I concur with my brother Johnson, that the judgment of the General Sessions should be affirmed.

In determining this case, the Court of Appeals laid down and affirmed the following propositions:

1. That the prohibitory act, in its operation upon property intoxicating liquors existing in the hands of any citizen of this state when the act took effect, is a violation of the provision constitution of this state, which decrees that no person be " deprived of life, liberty or property, without due process of law." The court is of opinion that the various provi-

sions, prohibitions, and penalties contained in the act substantially destroy the property in such liquors, in violation of the terms and spirit of the constitutional provision.

2. That inasmuch as the act does not discriminate between such liquors existing when it took effect as a law, and such as might be acquired by importation or manufacture, and does not countenance or warrant any defence based upon the distinction referred to, it can not be sustained in respect to any such liquor, whether existing at the time the act took effect, or acquired subsequently; although all the judges were of opinion that it would be competent for the legislature to pass such an act as the one under consideration (except as to some of the forms of the proceeding to enforce it,) provided such act should be plainly and distinctly prospective as to the property on which it should operate.

Judgment of the Sessions and Supreme Court reversed.